## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| S. BLAKE MURCHISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | C.A. No. 09-00169-SLR |
| | ) | |
| GMAC LLC, T.K. DUGGAN, | ) | |
| DOUGLAS A. HIRSCH, ROBERT W. | ) | |
| SCULLY, LENARD B. TESSLER, MARK A. | ) | |
| NEPORENT, FRANK W. BRUNO, SETH P. | ) | |
| PLATTUS, RAY G. YOUNG, FREDERICK | ) | |
| A. HENDERSON, MARK R. LANEVE, and | ) | |
| WALTER G. BORST, | ) | |
| | ) | |
| Defendants. | ) | |

## OPENING BRIEF IN SUPPORT OF GMAC INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT

Robert J. Kopecky
Daniel E. Laytin
Jennifer W. Cowen
Rana Barakat
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

Daniel A. Dreisbach (#2583)
dreisbach@rlf.com
Lisa A. Schmidt (#3019)
schmidt@rlf.com
Kelly E. Farnan (#4395)
Farnan@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700

*Attorneys for Defendant GMAC Inc.*

Dated: July 14, 2009

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND .....................................................................................................................3

ARGUMENT...........................................................................................................................9

I.      The "No-Action" Clause In The Indenture Precludes Plaintiff From Bringing Any
        Claims In Connection With The SmartNotes Indenture. ....................................................9

II.     Count I Does Not State A Claim For Breach Of The SmartNotes Indenture. ...................11

III.    Count II Does Not State A Claim For Breach Of The Covenant Of Good Faith
        And Fair Dealing.............................................................................................................14

IV.     Count III Does Not State A Claim For Violation Of The Trust Indenture Act. ...............16

        A.      Plaintiff Does Not Allege Any Change In Principal, Interest Or Maturity
                Date Of The SmartNotes........................................................................................17

        B.      Plaintiff Does Not Allege Any Facts Establishing That His Right To
                Payment Has Been Impaired...................................................................................17

V.      Count IV Does Not State A Claim For Equitable Rescission...........................................21

VI.     Count V Does Not State A Claim For Equitable Subordination. ......................................24

CONCLUSION......................................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accenture Global Servs. GmbH v. Guidewire Software Inc.*,
  581 F. Supp. 2d 654 (D. Del. 2008)..................................................................... 18, 19

*Anspach v. City of Philadelphia, Dep't. of Public Health*,
  503 F.3d 256 (3d Cir. 2007)...................................................................................... 3

*Ashcroft v. Iqbal*,
  129 S.Ct. 1937 (2009)......................................................................................... 18, 19

*Bank of New York v. Battery Park City Auth.*,
  675 N.Y.S.2d 860 (N.Y. App. Div. 1998) .............................................................. 10

*Bank of New York v. First Millennium, Inc.*,
  598 F. Supp. 2d 550 (S.D.N.Y. 2009)...................................................................... 16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................... 18, 19

*C3 Media & Mktg. Group, LLC v. Firstgate Internet, Inc.*,
  419 F. Supp. 2d 419 (S.D.N.Y. 2005)...................................................................... 21

*Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims*,
  160 F.3d 982 (3d Cir. 1998)..................................................................................... 24

*Conklin v. City of Saratoga Springs*,
  699 N.Y.S.2d 820 (N.Y. App. Div. 1999) .............................................................. 22

*DeRaffele v. 210-220-230 Owners Corp.*,
  823 N.Y.S.2d 202 (N.Y. App. Div. 2006) .............................................................. 22

*Elliot Assocs., L.P. v. Bio-Response, Inc.*,
  1989 WL 55070, at *2-4 (Del. Ch. May 23, 1989)................................................. 13

*Fehr Bros., Inc. v. Scheinman*,
  509 N.Y.S.2d 304 (N.Y. App. Div. 1986) ......................................................... 13, 19

*Feldbaum v. McCrory Corp*,
  1992 WL 119095, at *5-6 (Del. Ch. June 2, 1992)............................................ 10, 11

*Friedman v. Chesapeake & Ohio Ry. Co.*,
  261 F. Supp. 728 (S.D.N.Y. 1966),
  *aff'd*, 395 F.2d 663 (2d Cir. 1968)......................................................................... 10

ii

*Girl Friends Prods., Inc. v. ABC, Inc.,*
   2000 WL 1505978, at *5 n.3 (S.D.N.Y. Oct. 10, 2000) ................................................ 21

*In re 80 Nassau Assocs.,*
   169 B.R. 832 (Bankr. S.D.N.Y. 1994)........................................................................... 24

*In re Loral Space & Commc'ns Inc. Consol. Litig.,*
   2008 WL 4293781, at *35 (Del. Ch. Sept. 19, 2008),
   *reconsideration denied,*
   2008 WL 4561146 (Del. Ch. Oct. 6, 2008) ............................................................ 12, 13

*In re NAHC, Inc. Sec. Litig.,*
   306 F.3d 1314 (3d Cir. 2002)........................................................................................ 3

*In re Northwestern Corp.,*
   313 B.R. 595 (Bankr. D. Del. 2004) ....................................................................... 16, 17

*In re Poughkeepsie Hotel Assocs. Joint Venture,*
   132 B.R. 287 (Bankr. S.D.N.Y. 1991) .......................................................................... 24

*In re Submicron Sys. Corp.,*
   291 B.R. 314 (D. Del. 2003) ................................................................................... 23, 24

*In re The Drexel Burnham Lambert Group, Inc.,*
   1990 WL 302177 at *8 (Bankr. S.D.N.Y. Dec. 14, 1990)............................................. 24

*JPMorgan Chase Bank, N.A., v. IDW Group, LLC,*
   2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009) ........................................................ 15

*Lange v. Citibank, N.A.,*
   2002 WL 2005728, at *6-7 (Del. Ch. Aug. 13, 2002) .................................................. 10

*Lorenz v. CSX Corp.,*
   1 F.3d 1406 (3d Cir. 1993)..................................................................................... 14, 15

*McMahan & Co. v. Wherehouse Entm't, Inc.,*
   859 F. Supp. 743 (S.D.N.Y. 1994),
   *rev'd in part on other grounds,*
   65 F.3d 1044 (2d Cir. 1995).................................................................................... 10, 11

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,*
   716 F. Supp. 1504 (S.D.N.Y. 1989)........................................................................ 14, 15

*New Shows, S.A. de C.V. v. Don King Productions, Inc.*
   210 F.3d 355, 2000 WL 354214, at *2 (2d Cir. 2000) ................................................. 23

*New York City Dep't of Finance v. Twin Rivers, Inc.,*
   920 F. Supp. 50 (S.D.N.Y. 1996) ................................................................................ 13

*Parker & Waichman v. Napoli*,
  815 N.Y.S.2d 71 (N.Y. App. Div. 2006) ........................................................ 22

*Peak Partners, LP v. Republic Bank*,
  191 F. App'x. 118 (3d Cir. 2006) ........................................................... 10, 14

*Phillips v. County of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) .................................................................... 18

*Pile Found. Constr. Co. v. Berger, Lehman Assocs. P.C.*,
  676 N.Y.S.2d 664 ................................................................................. 22

*Romanoff v. Superior Career Institute, Inc.*,
  415 N.Y.S.2d 457 (N.Y. App. Div. 1979) ...................................................... 22

*Rosewood Apartments Corp. v. Perpignano*,
  200 F. Supp. 2d 269 (S.D.N.Y. 2002) .......................................................... 22

*Rudman v. Cowles Commcn's, Inc.*,
  330 N.Y.S.2d 33 (N.Y. 1972) ................................................................... 23

*Strategic Growth Int'l, Inc. v. RemoteMDx, Inc.*,
  2008 WL 4179235, at *5 (S.D.N.Y. Sept. 10, 2008) ...................................... 21, 23

*Terwilliger v. Terwilliger*,
  206 F.3d 240 (2d Cir. 2000) ................................................................ 12, 19

*UPIC & Co. v. Kinder-Care Learning Ctrs., Inc.*,
  793 F. Supp. 448 (S.D.N.Y. 1992) ......................................................... 10, 16

**Statutes**

15 U.S.C. § 77aaa ....................................................................................... 16

15 U.S.C. § 77ppp(b) ............................................................................... 16, 17

**Other Authorities**

38 Am. Jur. 2d *Guaranty* § 2 (2009)................................................................. 19

5A Charles A. Wright & Arthur R. Miller,
  *Federal Practice & Procedure* § 1327 (3d ed. 2004) ......................................... 11

American Bar Foundation,
  *Commentaries on Model Debenture Indenture Provisions* (1971).............................. 10

Black's Law Dictionary (8th Ed. 2004)............................................................... 12

Restatement (First) of Security (1941) .............................................................. 12

iv

## INTRODUCTION

In November 2008, in order to strengthen its balance sheet in the face of a capital and liquidity crisis, GMAC LLC ("GMAC") commenced a private exchange and tender offer to holders of some of its outstanding unsecured debt. That offer was an essential part of GMAC's effort to become a bank holding company, which required GMAC to increase its regulatory capital and reduce its outstanding debt. Becoming a bank holding company, in turn, improved GMAC's financial stability by providing GMAC greater financial flexibility, increased ability to raise capital, and access to funds under the Troubled Asset Relief Program ("TARP"). The Federal Reserve approved GMAC's application to become a bank holding company on December 24, 2008. Thereafter, GMAC received $5 billion in new equity through the U.S. Treasury's purchase of GMAC preferred membership interests, and an additional $7.5 billion in equity capital from the Treasury in May 2009.

Plaintiff, whose "SmartNotes" debt securities were not subject to the exchange and tender offer, challenges the transaction on several grounds, all of which center on the assertion that the exchange offer unfairly disadvantaged him by impairing the value of his notes. Each of the claims asserted against GMAC in Counts I through V of the First Amended Complaint ("FAC" or "Complaint") should be dismissed as a matter of law.[1]

As a threshold matter, plaintiff's claims for damages and equitable relief based on the SmartNotes indenture are barred by the "no action" clause in the indenture, which provides that a noteholder may not assert any claim with respect to the indenture unless holders of at least 25% of the outstanding notes have first requested that the indenture Trustee bring such an action

---

[1] The remaining count of plaintiff's First Amended Class Action Complaint, Count VI, asserts a claim only against the individual defendants, not GMAC.

and the Trustee has failed to do so.   Plaintiff has not even pleaded that he satisfies this prerequisite to his action.

Counts I through V also fail to state any legally sufficient claims against GMAC. Count I, which alleges a breach of the SmartNotes indenture, fails to state a claim because it is apparent from the face of the Complaint and the documents it incorporates that the exchange and tender offer did not breach any indenture provision or result in any default by GMAC under the indenture.   Count II similarly fails to state a claim for breach of the covenant of good faith and fair dealing because the exchange and tender offer did not violate any prohibition that could reasonably be implied in the indenture.   Count III fails to state a claim under the Trust Indenture Act because plaintiff does not allege that GMAC has failed to make any payments when due on any SmartNotes, and the offer has not impaired plaintiff's right to payment of interest or principal on his notes.   Count IV fails to state a claim entitling plaintiff to the remedy of "equitable rescission" because he has no right to seek rescission of contracts between GMAC and third parties who participated in the offer, and in any event has failed to allege any legally sufficient basis for rescission.   Finally, plaintiff's Count V claim for equitable subordination, a bankruptcy remedy, fails to state a claim because GMAC is not in bankruptcy, the noteholders whose rights plaintiff seeks to subordinate are not before the court, and plaintiff has not alleged that any noteholders who participated in the exchange engaged in inequitable conduct.

Plaintiff had the benefit of GMAC's motion to dismiss his original complaint before filing this Amended Complaint.   But plaintiff has done nothing to cure the numerous

RLF1-3415453-1

defects in his claims as set forth in detail by GMAC's motion.[2]   Accordingly, dismissal of plaintiff's current Complaint should be with prejudice, and judgment should be entered in GMAC's favor.

## BACKGROUND[3]

GMAC is a financial services company engaged in, among other things, the financing of General Motors Corporation ("GM") automobile purchases by dealers and consumers.[4]  Over the years, GMAC has issued a series of unsecured debt instruments to finance its lending operations.  As of September 30, 2008, GMAC had approximately $38.7 billion of outstanding unsecured debt.  (FAC, D.I. 65, ¶ 48)  Included in this outstanding debt was approximately $14.6 billion of so-called SmartNotes.  (*Id.* Ex. B, GMAC 11/20/08 Form 8-K, at Ex. 99.1)

GMAC has issued SmartNotes at various times since 1996 through a series of public offerings registered with the SEC.  (FAC, D.I 65, ¶ 33)  The relevant terms governing the

---

[2]   The principal changes made in the Amended Complaint are (1) the deletion of Cerberus, ResCap and the ResCap directors as defendants, and (2) addition of the facially frivolous equitable subordination claim in Count V.

[3]   In addition to the facts alleged and the documents attached to the Complaint, the Court may consider documents "integral to or explicitly relied upon in the complaint," disclosure documents filed with the SEC, government press releases and quoted market prices for securities.  *E.g.*, *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (citing cases); *Anspach v. City of Philadelphia, Dep't. of Public Health*, 503 F.3d 256, 273 n.11 (3d Cir. 2007).  Thus, in ruling on GMAC's motion to dismiss, it is appropriate for the Court to consider the SmartNotes Indenture, GMAC's filings with the SEC related to the challenged bond exchange, U.S. Treasury Department press releases regarding its investment in GMAC, market prices for the SmartNotes, and Moody's current bond rating on GMAC.

[4]   On June 30, 2009, GMAC was converted from a Delaware limited liability corporation into a Delaware corporation and was renamed "GMAC Inc."  (Def. Ex. A, GMAC 7/1/09 Form 8-K)  This change is immaterial to plaintiff's claims.

3

SmartNotes are set forth in an Indenture dated September 24, 1996, as amended (the

"SmartNotes Indenture").  (*Id.* ¶ 35; Def. Ex. B)[5].  These unsecured debt instruments were issued

in a wide range of maturities and interest rates.  Purchasers of the notes had the option to receive

interest monthly, quarterly, semi-annually or annually.  (FAC, D.I. 65, ¶ 37)

  In addition to the SmartNotes, GMAC also had outstanding at September 30,

2008 billions of dollars in other unsecured debt (issued in both dollars and euros).  (FAC, D.I.

65, ¶ 48; *see* D.I. 65 Ex. B, at Ex. 99.1)  Much of that debt was held by persons who are

"qualified institutional buyers" as defined by SEC Rule 144A and certain non-U.S. "qualified

buyers." (*See id.* ¶ 47)

  Plaintiff S. Blake Murchison alleges he has purchased and owns several series of

GMAC SmartNotes.  (FAC, D.I. 65, ¶ 6)

**The SmartNotes Indenture**

  The SmartNotes Indenture is a contract between purchasers of those notes and the

issuer, GMAC.  (FAC, D.I. 65, ¶ 36)  Several provisions of the Indenture are relevant to

plaintiff's claims in this action.

  Article VI provides for certain "Events of Default."  Specifically, **Section 6.01**

sets forth the following five occurrences constituting Events of Default:

  (a) default in payment of the principal when due;

  (b) default in payment of any installment of interest when due;

  (c) failure of GMAC to observe or perform any of the other covenants or
    agreements in the Indenture;

---

5 Citations to Def. Exs. A-G are to the Declaration of Kelly E. Farnan being filed
 contemporaneously herewith.

4

> (d) entry by a court of an order of relief in respect of GMAC in an involuntary bankruptcy case or similar proceeding; and
>
> (e) commencement by GMAC of a voluntary bankruptcy case or similar proceeding.

(Def. Ex. B § 6.01)

 With respect to remedies available to noteholders, **Section 6.04** of the Indenture provides: "No holder of any Note of any series shall have any right by virtue or by availing of any provision of this Indenture to institute any action or proceedings at law or in equity or in bankruptcy or otherwise, upon or under or with respect to this Indenture," unless

> (a) "such holder shall previously have given to the Trustee written notice of an Event of Default and of the continuance thereof";
>
> (b) "the holders of not less than twenty-five percent in aggregate principal amount of the Notes of such series then outstanding shall have made written request upon the Trustee to institute such action or proceeding in its own name as trustee";
>
> (c) "such holder or holders shall have offered to the Trustee such indemnity satisfactory to it against the costs, expenses and liabilities to be incurred"; and
>
> (d) "the Trustee for sixty days after its receipt of such notice, request and offer of indemnity shall have failed to institute any such action or proceedings."

(*Id.* § 6.04)  The only exception to this "no action" provision is that a noteholder may institute suit without first making such demand on the Trustee to enforce the company's obligation to pay principal or interest on any Note "*on or after the respective due date expressed in such Note.*" (*Id.* (emphasis added))

 Article X sets forth the provisions governing the adoption of supplemental indentures (*i.e.*, amendments to the Indenture) and the noteholder consents necessary to effect such amendments.  Some amendments require no noteholder approval (§ 10.01), while others require approval by holders of two-thirds of the aggregate principal amount (§ 10.02).  In

5

addition, **Section 10.02** provides that the company and the Trustee may not enter into any supplemental indenture to:

    (a)    "change the fixed maturity of any Notes, or reduce the principal amount thereof (and premium if any) or reduce the rate or extend the time of payment of any interest thereon" without the consent of the affected holder;

    (b)    "impair the right to institute enforcement of any such payment [of principal or interest] on or after the stated maturity thereof (or in the case of redemption, on or after the redemption date therefor)"; or

    (c)    reduce the percentage of noteholders necessary to approve certain types of supplemental indentures.

(*Id.* § 10.02)

Finally, Article XII sets limitations on GMAC's ability to pledge or subject its assets to liens.  Specifically, **Section 12.01** provides that, subject to certain exceptions,

> the Company will not at any time pledge or otherwise subject to any lien any of its property or assets without thereby expressly securing the due and punctual payment of the principal of and interest on the Notes equally and ratably with any and all other obligations and indebtedness secured by such pledge or other lien, so long as any such other obligations and indebtedness shall be so secured, and the Company covenants that if and when such pledge or other lien is created, the Notes will be so secured thereby.

(*Id.* § 12.01)  The Indenture defines "the Company" as General Motors Acceptance Corporation or its successor corporation (subsequently GMAC LLC, and now GMAC Inc.).  (*Id.* § 1.01)

**The Exchange Offer**

As set forth in the Complaint and exhibits thereto, and widely reported in the press, GMAC's business has been under substantial pressure due to disruptions in the automobile industry, the real estate market, and the credit markets.  In October 2007, Moody's Investor Service cut GMAC's debt rating to its lowest level ever.  (FAC, D.I. 65, ¶ 29)  In late 2008, GMAC faced a serious capital and liquidity crisis.  To meet that crisis, GMAC began taking steps to shore up its balance sheet and to convert itself into a bank holding company.  (*Id.* ¶ 31)

6

By doing so, GMAC would enjoy greater financial flexibility, including an expected increased ability to raise capital, borrow money and issue securities. (*Id.* ¶ 50) In particular, GMAC could apply for access to funds made available by Congress under TARP. (*Id.* ¶ 31)

In order to meet the requirements for becoming a bank holding company, "[t]he Federal Reserve had required GMAC to, among other things, achieve a minimum amount of total regulatory capital of $30 billion in connection with its application." (FAC, D.I. 65, ¶ 52) To do so, GMAC needed to reduce its outstanding debt, among other things. Thus, as disclosed in its November 20, 2008 Form 8-K, GMAC commenced a private exchange and tender offer to holders of certain series of its outstanding unsecured debt which, if successful, would "increase GMAC's capital levels while reducing the amount of its outstanding debt," and would generate a "significant portion" of additional capital as required by the Federal Reserve. (*Id.* Ex. B)

Under the terms of the exchange and tender offer commenced on November 20, 2008 (the "Exchange Offer"), "eligible holders" of certain GMAC notes (not including the SmartNotes) were given the opportunity to sell or exchange their notes for either cash or a combination of new unsecured, unsubordinated notes and preferred stock (the preferred stock to be issued by a wholly-owned subsidiary of GMAC). (FAC, D.I. 65, ¶ 47 & Ex. B) The amount of cash, the principal amount of the new notes, and the amount of preferred stock varied depending on the maturity of the old notes, but in every case reflected a discount from the face amount of the old notes. (*Id.* Ex. B) The new notes issued pursuant to the Exchange Offer were guaranteed, on a joint and several basis, by five GMAC subsidiaries. As explained in GMAC's Form 8-K, "[t]he note guarantees will rank senior to all subordinated debt of such note guarantor" — *i.e.*, senior to the subordinated debt of the *subsidiaries* — but *not* senior to any other debt of GMAC. (*Id.*)

7

On December 24, 2008, GMAC's application to become a bank holding company was approved.  (FAC, D.I. 65, ¶ 55)  Following that approval, on December 29, 2008, GMAC received $5 billion in additional equity capital from the U.S. Treasury in the form of preferred equity.  (Def. Ex. C (1/2/09 Form 8-K))  On December 31, 2008, GMAC completed the Exchange Offer, which reduced GMAC's outstanding debt by approximately $10 billion.  (Def. Ex. D (2/27/09 Form 10-K))  After completion of the Exchange Offer, the market prices of plaintiff's SmartNotes were materially higher than at the time GMAC commenced the offer in November 2008.  (Def. Ex. E (Bloomberg valuation data for each of plaintiff's bonds, as alleged in FAC ¶ 6))

**GMAC's Financial Condition**

Without any supporting factual allegations, plaintiff makes the conclusory allegation that GMAC is "now on the brink of bankruptcy and liquidation" and "will likely enter into bankruptcy or become terminally insolvent in the next month, if not weeks."  (FAC, D.I. 65, ¶ 59)[6]  This was the same conclusory, and now historically debunked, allegation plaintiff made in his original complaint filed on March 13, 2009.  Nearly four months have passed since plaintiff filed his original Complaint alleging that GMAC was "on the brink of bankruptcy and

---

[6]   Plaintiff quotes a portion of GMAC's May 29, 2009 8-K describing amendments to certain contracts between GM and GMAC, implying that those amendments somehow support his allegation of impending bankruptcy.  (FAC, D.I. 65, ¶ 60)  The snippets of the 8-K that plaintiffs quote, however, merely state that (1) should GM decide to "discontinue, sell or phase out a vehicle nameplate brand," GM or GMAC may need to reimburse the other party for attendant gains or losses relating to that decision, and, unrelatedly, (2) if GMAC determines that its unsecured exposure to GM exceeds a certain threshold, GM is obligated to take steps to reduce such exposure.  (*Id.* Ex. D)  Plaintiff does not allege, because he cannot, that these amended contract terms make GMAC's financial situation more precarious or closer to declaring bankruptcy.

liquidation" (Cmplt., D.I. 1, ¶ 83), and GMAC has not filed (or stated it is likely to file) a bankruptcy petition.

Plaintiff nevertheless repeats this allegation in the face of an even more compelling public record, of which this Court may take judicial notice, to the contrary. On May 21, 2009, the United States Department of the Treasury announced that it "made an investment of $7.5 billion in GMAC LLC" to "help address GMAC's capital needs." (Def. Ex. F) Consistent with this positive development, on June 10, 2009, Moody's upgraded its rating on GMAC's senior unsecured debt and stated it was placing its rating on review for further possible upgrade. (Def. Ex. G) Moody's stated that its upgrade reflected "the firm's lower bankruptcy risk resulting from the U.S. government's support of the firm." (*Id.*) GMAC's lower bankruptcy risk is also reflected in the market price for plaintiff's SmartNotes. Since plaintiff filed this action on March 13, 2009, the market prices of the four series of SmartNotes he bought have each increased between 100% and 200%. (*See* Def. Ex. E)

## ARGUMENT

Although plaintiff asserts that the Exchange Offer "arbitrarily" excluded holders of SmartNotes, plaintiff does not allege that anything in the SmartNotes Indenture required GMAC to make an exchange offer to holders of all its debt securities. Instead, the gravamen of plaintiff's Complaint is that the specific terms on which GMAC made the Exchange Offer, rather than the fact of the offer itself, violated plaintiff's rights under the SmartNotes Indenture and the Trust Indenture Act. None of plaintiff's legal theories states a viable claim for relief.

**I.     The "No-Action" Clause In The Indenture Precludes Plaintiff From Bringing Any Claims In Connection With The SmartNotes Indenture.**

Section 6.04 of the SmartNotes Indenture provides that a holder of SmartNotes has no right "to institute any action or proceedings at law or in equity or in bankruptcy or

9

otherwise, upon or under or with respect to this Indenture," unless (1) the holder gives notice to the Trustee of any alleged default, (2) holders of at least 25% of the principal amount of the affected series of notes make written request on the Trustee to initiate an action, (3) such holders offer to indemnify the Trustee against costs and expenses to be incurred, and (4) the Trustee fails to commence such action within 60 days after compliance with items (1)-(3).  (Def. Ex. B, § 6.04)   The purpose of such "no-action clauses," which are commonly included in bond indentures, is to prevent a small number of bondholders — or a single bondholder like plaintiff — from taking action against the issuer without first presenting the action to the trustee and giving it the opportunity to assert the claims on behalf of all holders.  American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions*, 232-34 (1971).[7]

Both federal and state courts have repeatedly dismissed bondholder actions where plaintiffs failed to comply with the requirements of no-action clauses contained in indentures governed by New York law (like the SmartNotes Indenture).  *E.g.*, *Peak Partners, LP v. Republic Bank*, 191 F. App'x. 118, 126-27 (3d Cir. 2006); *McMahan*, 859 F. Supp. at 747-49; *Friedman v. Chesapeake & Ohio Ry. Co.*, 261 F. Supp. 728, 730-31 (S.D.N.Y. 1966), *aff'd*, 395 F.2d 663, 664 (2d Cir. 1968); *Lange v. Citibank, N.A.*, 2002 WL 2005728, at *6-7 (Del. Ch. Aug. 13, 2002); *Bank of New York v. Battery Park City Auth.*, 675 N.Y.S.2d 860 (N.Y. App. Div. 1998).   In *Feldbaum v. McCrory*, Chancellor Allen explained that such provisions "protect against the exercise of poor judgment by a single bondholder or a small group of bondholders,

---

[7]   Numerous courts have cited the American Bar Foundation *Commentaries* in explaining the purpose and utility of such no-action provisions. *See, e.g., McMahan & Co. v. Wherehouse Entm't, Inc.*, 859 F. Supp. 743, 747 (S.D.N.Y. 1994), *rev'd in part on other grounds*, 65 F.3d 1044 (2d Cir. 1995); *Feldbaum v. McCrory Corp*, 1992 WL 119095, at *5-6 (Del. Ch. June 2, 1992); *UPIC & Co. v. Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 454 (S.D.N.Y. 1992).

who might otherwise bring a suit against the issuer that most bondholders would consider not to be in their collective economic interest." 1992 WL 119095, at *6. And such clauses apply equally to claims alleging breach of the covenant of good faith and fair dealing implied in bond indentures. *E.g., McMahan*, 859 F. Supp. at 746, 749; *Feldbaum*, 1992 WL 119095, at *8.

Plaintiff does not (and cannot) allege that he has satisfied any of the requirements of Section 6.04. Accordingly, plaintiff's claims based on alleged breaches of the SmartNotes Indenture (Counts I, II, IV and V) must be dismissed.

## II.   Count I Does Not State A Claim For Breach Of The SmartNotes Indenture.

Plaintiff's claim for breach of the SmartNotes Indenture should be dismissed for the independent reason that it states no viable cause of action. Plaintiff alleges in Count I that the Exchange Offer violated three purported terms of the Indenture, which plaintiff tellingly does not quote, but instead characterizes as providing:

- "that GMAC shall not issue, assume or guarantee any debt secured by the [respective] notes without effectively providing that the notes shall be secured equally and ratably with such debt" (FAC, D.I. 65, ¶ 82 (brackets in original));

- "that GMAC triggers a default when GMAC generally is not paying its debts as the same become due" (*Id.* ¶ 83); and

- "that GMAC cannot reduce the rate of or extend the time for payment of interest on the [respective] notes or reduce the principal or change the stated maturity of the [respective] notes, without the consent of affected noteholders" (*Id.* ¶ 84 (brackets in original)).

As explained below, each of these allegations misstates the terms of the SmartNotes Indenture.[8] Because no action allegedly undertaken by GMAC breaches any of the *actual* terms of the

---

[8]   When a disparity exists between the written instrument on which a claim is based and allegations in the complaint about the terms of that instrument, the terms of the written document will control. 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1327 (3d ed. 2004).

11

Indenture, which "are to be read strictly," plaintiff has not stated a claim for breach of the Indenture. *In re Loral Space & Commc'ns Inc. Consol. Litig.*, 2008 WL 4293781, at *35 (Del. Ch. Sept. 19, 2008), *reconsideration denied*, 2008 WL 4561146 (Del. Ch. Oct. 6, 2008).

*First*, there is no basis for plaintiff's claim that the Exchange Offer breaches an obligation that "GMAC shall not issue, assume or guarantee any debt secured by the [respective] notes without effectively providing that the notes shall be secured equally and ratably with such debt." (FAC, D.I. 65, ¶ 82)   The SmartNotes Indenture contains no such provision.   Section 12.01 prohibits GMAC only from "pledg[ing] or otherwise subject[ing] to any lien any of its property or assets." (Def. Ex. B § 12.01)   The Complaint alleges no breach of this provision.

The Exchange Offer does not involve a pledge or lien of any GMAC property. Instead, as the Form 8-K cited in the Complaint makes clear, the additional protection provided to recipients of the new notes was in the form of unsecured guarantees issued by several GMAC subsidiaries. (FAC, D.I. 65, Ex. B at Item 8.01)   A guarantee is not a pledge or lien.   Pledges and liens provide their recipients with either a security interest or a "privilege of retention" in particular property of a debtor.   Restatement (First) of Security § 1 cmt. a (1941).   A guarantee, on the other hand, is merely a contractual promise of the guarantor to pay the debtor's obligations upon default. *See, e.g., Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir. 2000); Black's Law Dictionary (8th Ed. 2004).   Here, plaintiff does not (and cannot) allege that the guarantees provided in connection with the Exchange Offer encumbered any property of either GMAC or its subsidiaries.

Moreover, Section 12.01 only prevents "the Company" — defined as GMAC — from taking certain actions.   Plaintiff does not allege that *GMAC* provided any guarantee or additional security to recipients of the new notes.   Rather, as explained above, participants in the Exchange Offer received guarantees from certain GMAC *subsidiaries*. (FAC, D.I. 65, Ex. B at

12

Item 8.01)   This obligation is separate and distinct from the obligations of GMAC to its debtholders.  *See e.g., New York City Dep't of Finance v. Twin Rivers, Inc.*, 920 F. Supp. 50, 52 (S.D.N.Y. 1996) (guarantee is a "collateral promise to answer for the payment or a debt or obligation of another"); *Fehr Bros., Inc. v. Scheinman*, 509 N.Y.S.2d 304, 305-06 (N.Y. App. Div. 1986) (a guarantee "is a separate, independent obligation between the guarantor and the creditor-obligee").   Nothing in Section 12.01 prohibits GMAC's subsidiaries from providing such guarantees, and plaintiff's claim that the Exchange Offer violated Section 12.01 fails as a matter of law. *See Loral*, 2008 WL 4293781, at *35.

　　　　**Second**, plaintiff's allegation that "GMAC triggers default" under the Indenture "when GMAC generally is not paying its debts" (FAC, D.I. 65, ¶ 83) cannot state a cause of action because (1) the Complaint does not allege that GMAC is not paying its debts, and (2) the Indenture does not contain any such default provision.  The Indenture does specify certain events that constitute Events of Default, including a default in the payment of either the principal or any installment of interest on any of the Notes "when the same shall become due and payable."  (Def. Ex. B § 6.01(a), (b))  But plaintiff does not allege that GMAC has failed to make any principal or interest payment when due with respect to any of his SmartNotes.  Plaintiff alleges only that "there is *a substantial likelihood* that GMAC will not be able to pay the Smart Notes when they become due." (FAC, D.I. 65, ¶ 83 (emphasis added))  That speculative allegation regarding what may or may not happen years in the future, however, does not establish an Event of Default.  *See Elliot Assocs., L.P. v. Bio-Response, Inc.*, 1989 WL 55070, at *2-4 (Del. Ch. May 23, 1989) (under indenture governed by New York law, allegation that issuer might fail to redeem debentures in future did not establish an event of default).

　　　　**Third**, although plaintiff paraphrases Section 10.02 of the Indenture in Count I, he does not allege any violation of the actual terms of that section.  Section 10.02 governs the

13

circumstances under which GMAC may issue supplemental indentures amending the SmartNotes. (Def. Ex. B § 10.02) But plaintiff does not allege that GMAC issued any supplemental indenture or amended the terms of the SmartNotes in connection with the Exchange Offer. Moreover, Section 10.02 prohibits only such amendments that would "change the fixed maturity," "reduce the principal amount," "extend the time of payment of any interest," or "impair the right to sue for enforcement" of any payment due on the Notes. (*Id.*) Plaintiff alleges no such action; he merely reiterates the assertion that "there is a substantial likelihood that GMAC will not be able to pay" the Notes when they become due. (FAC, D.I. 65, ¶ 84) This is no more a breach of Section 10.02 than of Section 6.01(a). *See Peak Partners*, 191 F. App'x. at 123. Indeed, it is based on a provision of the Indenture that is plainly inapplicable to the facts alleged in the Complaint.

In sum, plaintiff's misstatements of the Indenture's terms cannot manufacture a claim for breach of the Indenture. Count I should be dismissed with prejudice.

### III.  Count II Does Not State A Claim For Breach Of The Covenant Of Good Faith And Fair Dealing.

Nor can plaintiff re-write the Indenture to his liking by characterizing his claim as arising from the covenant of good faith and fair dealing. The implied covenant prohibits a contracting party from taking action that "would prevent the other party from receiving the fruits of the contract." *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1415 (3d Cir. 1993). "The covenant, however, cannot be used to insert new terms that were not bargained for." *Id.* Thus, unless the defendant has deprived bondholders of "a right or benefit specifically provided to them in the indenture," there is no violation of the covenant of good faith and fair dealing. *Id.*; *see also Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1517 (S.D.N.Y. 1989)

14

(covenant of good faith and fair dealing has no application where the issuer of notes has not deprived noteholders of the "express, explicitly bargained-for benefits" in the relevant contract).

Here, plaintiff has not alleged that the Exchange Offer violates any express Indenture term, but instead asks the Court to read into the Indenture a term prohibiting GMAC from doing anything that *might* increase plaintiff's risk of nonpayment. To infer such a prohibition "would, in effect, add a new term to the indenture, and the implied covenant can never be used for that purpose." *Lorenz*, 1 F.3d at 1416. Indeed, the *Metropolitan Life* court rejected a claim nearly identical to the one plaintiff makes here, stating that "there is no implied covenant restricting any action that might subject plaintiffs' investment to greater risk of non-payment." *Metropolitan Life*, 716 F. Supp. at 1519 n.24. Accordingly, plaintiff's claim for breach of the covenant of good faith and fair dealing should be dismissed for failure to state a claim. *See Lorenz*, 1 F.3d at 1416-17 (affirming dismissal of implied covenant claim relating to a New York-law-governed Indenture); *Metropolitan Life*, 716 F. Supp. at 1519 (refusing to permit an implied covenant "to shoehorn into an indenture additional terms plaintiffs now wish had been included").

Moreover, Count II should be dismissed because plaintiff's covenant of good faith and fair dealing claim is impermissibly duplicative of his breach of contract claim. To "simultaneously plead breach of contract and implied covenant claims under New York law, a plaintiff must . . . base its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims." *JPMorgan Chase Bank, N.A., v. IDW Group, LLC*, 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009). Here, plaintiff's implied covenant claim and breach of contract claim rest on the same factual predicate. Therefore, the implied covenant claim cannot survive a motion to dismiss. *See id.* ("a claim for breach of the implied covenant of good

15

faith can survive a motion to dismiss only if it is based on allegations different from those underlying the accompanying breach of contract claim") (internal quotations omitted).

## IV.   Count III Does Not State A Claim For Violation Of The Trust Indenture Act.

Plaintiff also fails to state a claim under the Trust Indenture Act of 1939.  15 U.S.C. §§ 77aaa, *et seq.* (the "TIA").  Section 316(b) of the TIA provides that "the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder." *Id.* § 77ppp(b).[9]  Although case law on the TIA is sparse, courts have repeatedly recognized that Section 316(b) only prohibits amendments of a "core term," meaning "one affecting a securityholder's right to receive payment of the principal of or interest on the indenture security on the due dates for such payments." *UPIC & Co. v. Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 452 (S.D.N.Y. 1992); *see Bank of New York v. First Millennium, Inc.*, 598 F. Supp. 2d 550, 565 (S.D.N.Y. 2009).  More specifically, as one court in this jurisdiction has clarified, the provision prohibits impairment of a bondholder's "*legal* rights" to payment but not the "*practical* rights to the principal and interest itself." *In re Northwestern Corp.*, 313 B.R. 595, 600 (Bankr. D. Del. 2004) (emphasis in original).

In the Exchange Offer, GMAC did not amend any terms of the Indenture, let alone any of its "core terms," or alter plaintiff's legal rights as a SmartNotes holder.  And plaintiff's conclusory allegations of "practical" effects are based on two unfounded premises: (1)

---

[9]   While plaintiff refers in passing to other provisions of the Act, Section 316(b) is the only section that could even potentially provide him with any claim under the Act.

16

that the SmartNotes have been "subordinated" by the newly-issued notes in such a way as to impair plaintiff's priority in a GMAC bankruptcy (FAC, D.I. 65, ¶ 93); and (2) that plaintiff's right to payment on his SmartNotes has been "impaired" because GMAC is "on the brink of bankruptcy and liquidation" (*id.* ¶ 59). Neither proposition is supported by any well-pleaded allegations, and in fact both are refuted by other portions of plaintiff's pleadings. In the end, plaintiff's allegations not only fail to support a plausible inference of *impairment* — they actually describe an *improvement* in the situation of all GMAC debtholders.

### A.   Plaintiff Does Not Allege Any Change In Principal, Interest Or Maturity Date Of The SmartNotes.

First and foremost, plaintiff does not allege that GMAC has failed to pay principal or interest due under the SmartNotes, altered its legal obligation to do so, or otherwise amended the contractual relationship between GMAC and holders of SmartNotes. *See* 15 U.S.C. § 77ppp(b). None of plaintiff's allegations implicate what the TIA prohibits: alteration of the *legal* right to receive payment in a particular amount and on a particular date without the holder's consent.[10] *See Northwestern Corp.*, 313 B.R. at 600.

### B.   Plaintiff Does Not Allege Any Facts Establishing That His Right To Payment Has Been Impaired.

Unable to allege that he has lost his legal right to payment of principal and interest on the SmartNotes as promised, plaintiff relies on an expansive view of the TIA by alleging an indirect "impairment" resulting from events unrelated to the SmartNotes. In addition

---

[10]   By way of contrast, the participants in the Exchange Offers actually *did* experience a change in their "right to payment" under their old notes: they expressly agreed to a reduction in principal as part of the exchange transactions. (*See* FAC, D.I. 65, Ex. B (disclosing that every $1000 of principal in old notes would be exchanged for principal amounts ranging from $500 to $850 in new notes, plus preferred stock in some cases))

17

to being too attenuated from the terms and purpose of the statute, plaintiff's conclusory assertions about the "substantial likelihood" of a "liquidation process" in which plaintiff's notes would "not be redeemed" are not supported by any factual allegations. Rather, GMAC's public disclosures make clear that (1) the new notes do not have priority over the SmartNotes with respect to GMAC's assets, and (2) far from being on the "brink" of liquidation, GMAC is in a stronger financial position now as a result of the Exchange Offer. (FAC, D.I. 65, Ex. B; Def. Ex. D)

Although plaintiff makes the conclusory allegation that participants in the Exchange Offer received notes giving them "priority ahead of previously equal bond holders, including Plaintiff, in the event of GMAC's bankruptcy" (FAC, D.I. 65, ¶ 58), he does not allege facts supporting that assertion, or sufficient to establish the "plausible" inference that federal pleading standards require. *See Accenture Global Servs. GmbH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 661 (D. Del. 2008) (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 231-32 (3d Cir. 2008), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Instead, the materials attached to plaintiff's Complaint and referenced in paragraph 46 establish only that the new notes are guaranteed by five GMAC subsidiaries: GMAC Latin America Holdings LLC, GMAC International Holdings Cooperatief U.A., GMAC Continental LLC, IB Finance Holding Company LLC and GMAC US LLC. (*See* FAC, D.I. 65, Ex. B (describing the private Exchange Offers in Item 8.01))

These guarantees provide holders of new notes with separate contractual claims against entities *other than GMAC* for repayment of their notes, but the status of such holders' claims to *GMAC's assets* has not changed. There is no legal basis for plaintiff's allegation that

18

the guarantees provided in the Exchange Offer gave recipients of new notes "priority ahead of previously equal bondholders" in the event of a GMAC bankruptcy, or would cause the SmartNotes to "cede to the purported priority of the new notes" in a GMAC liquidation. (FAC, D.I. 65, ¶¶ 58, 93)  Plaintiff can cite no authority for the proposition that a third party guarantee to bondholders gives them any higher priority claim to the assets of the original obligor on the bonds.  Indeed, the premise of his claim flies in the face of the settled law that a guarantee is a separate, independent obligation between the guarantor and the creditor-obligee, triggered only *after* the original obligor (here GMAC) has defaulted on payment. *See, e.g., Terwilliger*, 206 F.3d at 246; *Fehr Bros.*, 509 N.Y.S.2d at 305-06; 38 Am. Jur. 2d *Guaranty* § 2 (2009).  In short, the guarantees do not change the fact that, in bankruptcy, GMAC's assets would be divided among holders of old and new notes according to the same priority that existed before the Exchange Offer.[11]

This claim also rests on the implausible and unsupported allegation that GMAC is on the verge of bankruptcy and liquidation.  Plaintiff asserts that GMAC faces "certain bankruptcy and other insolvency" (FAC, D.I. 65, ¶ 1), that it is "on the brink of bankruptcy and liquidation" (*Id.* ¶ 59), and that the company "will likely enter into bankruptcy or become terminally insolvent in the next months, if not weeks" (*id.*).  Conclusory allegations such as these do not satisfy the federal pleading standards most recently articulated by the Supreme Court in

---

[11]  Plaintiff quotes a statement by a GMAC spokeswoman stating, without any explanation or substantiation, the legal conclusion that SmartNotes "would be subordinated to the new notes." (*See* FAC, D.I. 65, ¶¶ 4, 49 & Ex. C)  Whatever this public relations spokesperson said cannot change the legal effect of the guarantees provided to the recipients of the new notes in the Exchange Offer, which legally do not subordinate the rights of SmartNotes holders to those of participants in the Exchange Offer in a hypothetical future GMAC bankruptcy.

*Iqbal* and *Twombly*. *See Accenture Global*, 581 F. Supp. 2d at 661; *Iqbal*, 129 S.Ct. at 1950 (Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). Nor can they be reconciled with the public record of capital infusions by the United States government in GMAC, ratings upgrades of GMAC securities, and the dramatic rise in the market value of the SmartNotes. (*See* Def. Exs. F, G)

Moreover, plaintiff alleges no facts to support a plausible inference that the Exchange Offer itself made a GMAC bankruptcy more likely. To the contrary, as plaintiff alleges, the purpose of the Exchange Offer was for GMAC to obtain status as a bank holding company and thereby gain potential access to TARP money that would improve the company's liquidity and overall financial condition. (FAC, D.I. 65, ¶¶ 29, 31, 50, 52, Ex. B) In order to meet the requirements for becoming a bank holding company, the Federal Reserve "required GMAC to, among other things, achieve a minimum amount of total regulatory capital of $30 billion in connection with its application." (*Id.* ¶ 52) As GMAC disclosed, the Exchange Offer was designed to "increase GMAC's capital levels while reducing the amount of its outstanding debt," and to generate a "significant portion" of additional capital as required by the Federal Reserve. ( *Id.* Ex. B) By becoming a bank holding company, GMAC would be expected to enjoy greater financial flexibility, including increased ability to raise capital, borrow money and issue securities. (*Id.* ¶ 50)

As GMAC summarized in its Form 8-K, "[s]uccessful completion of the offers, conversion to a bank holding company under the BHC Act and participation in the Capital Purchase Program will reduce the need for GMAC to raise new funds and use its existing cash and cash equivalents and investment securities to repay old notes." (FAC, D.I. 65, Ex. B) GMAC also warned that failure to successfully convert to a bank holding company and complete the Exchange Offer could have a material adverse effect on GMAC's business, results of

20

operations, and financial position. (*Id.*) Thus, the success of the Exchange Offers meant an *increase* in the chances of GMAC being able to repay the SmartNotes in full — a far cry from the "impairment" the TIA prohibits. The positive effect of the Exchange Offer is reflected in the market prices for the series of SmartNotes owned by plaintiff, which were over twice as high immediately after the Exchange Offer closed than they were when it commenced. (*See* Def. Ex. E) And the market price of the notes has risen further since plaintiff filed his original complaint. (*See id.*)

## V.   Count IV Does Not State A Claim For Equitable Rescission.

Count IV of plaintiff's Complaint asserts that the Exchange Offer "unfairly, arbitrarily, and discriminatorily" allowed GMAC to select which among its noteholders were eligible to sell or exchange their notes for preferred stock or new notes. (FAC, D.I. 65, ¶ 100) Plaintiff seeks to have the Court "rescind the Exchange Offers and unwind any exchange of notes that has occurred thereto." (*Id.* ¶ 102) This claim fails for four reasons.

***First***, equitable rescission is a *remedy*, not an independent cause of action. *See e.g., Girl Friends Prods., Inc. v. ABC, Inc.*, 2000 WL 1505978, at *5 n.3 (S.D.N.Y. Oct. 10, 2000) ("Although plaintiffs also allege a separate claim of 'rescission,' rescission is simply an equitable remedy that might be available if a claim for legal liability were established.") (internal citation omitted) (applying New York law). An essential requirement for the remedy of equitable rescission under New York law is lack of an adequate remedy at law. *See, e.g., Strategic Growth Int'l, Inc. v. RemoteMDx, Inc.*, 2008 WL 4179235, at *5 (S.D.N.Y. Sept. 10, 2008). The Complaint, however, does not allege that plaintiff lacks an adequate remedy at law for any harm he claims to have suffered. For this reason alone, plaintiff's claim for equitable rescission in Count IV should be dismissed. *See, e.g., C3 Media & Mktg. Group, LLC v.*

21

*Firstgate Internet, Inc.*, 419 F. Supp. 2d 419, 435-36 (S.D.N.Y. 2005) (dismissing rescission claim under New York law for failure to allege lack of adequate remedy at law).

      ***Second***, plaintiff seeks rescission of contracts between GMAC and third party noteholders who participated in the Exchange Offer, but he has no standing to seek judicial cancellation of those contracts.   Contract law permits only contracting parties or third-party beneficiaries to sue for contract-based remedies.   *See, e.g., Parker & Waichman v. Napoli*, 815 N.Y.S.2d 71, 74 (N.Y. App. Div. 2006); *DeRaffele v. 210-220-230 Owners Corp.*, 823 N.Y.S.2d 202, 203 (N.Y. App. Div. 2006).   Under New York law, a plaintiff seeking judicial cancellation of a contract, typically referred to as "equitable rescission," must be a party to that contract.   *See, e.g., Romanoff v. Superior Career Institute, Inc.*, 415 N.Y.S.2d 457, 458 (N.Y. App. Div. 1979). Accordingly, a claim for equitable rescission by a plaintiff who is neither a party to a contract nor a third-party beneficiary fails to state a claim as a matter of law and must be dismissed.

      The Exchange Offer created binding contracts between GMAC and certain holders of GMAC and ResCap notes, but not with holders of SmartNotes.   (FAC, D.I. 65, ¶ 48) (In fact, plaintiff's primary complaint is that he was *not* a party to the Exchange Offer.)   Plaintiff can therefore seek rescission only if he has been granted rights as a third-party beneficiary. *Parker & Waichman,* 815 N.Y.S.2d at 74.   The touchstone for determining a party's status as a third-party beneficiary under New York law is the intent of the contracting parties, which must be clear from the language of the contract.   *See, e.g., Conklin v. City of Saratoga Springs*, 699 N.Y.S.2d 820, 821 (N.Y. App. Div. 1999); *Pile Found. Constr. Co. v. Berger, Lehman Assocs. P.C.*, 676 N.Y.S.2d 664, 665 (N.Y. App. Div. 1998).   The Complaint does not allege that anything in the Exchange Offer expresses such intent with respect to holders of SmartNotes. Plaintiff is thus not a third party beneficiary entitled to bring a cause of action for equitable rescission of the Exchange Offer, and lacks standing to maintain such an action.

22

*Third*, the Complaint does not allege the essential elements for this equitable remedy. Under New York law, there are five recognized grounds for rescission: (1) failure of consideration; (2) fraud in making the contract; (3) inability to perform the contract; (4) repudiation of the contract; and (5) a breach that substantially defeats the purpose of the contract. *Rosewood Apartments Corp. v. Perpignano*, 200 F. Supp. 2d 269, 272 (S.D.N.Y. 2002). Plaintiff alleges none of these. The Complaint cites nothing in the terms of the Exchange Offer or the SmartNotes Indenture that required GMAC to make an exchange offer for all of its outstanding debt securities. And plaintiff's generalized allegations that the Exchange Offer violated "equity, fairness, rationality, and essential principles of free market capitalism" do not constitute a valid basis for judicial cancellation of a contract under New York law. Count IV therefore fails to state any substantive basis for equitable rescission.

*Fourth*, there is no practical basis on which plaintiff can obtain rescission of the Exchange Offer in this action. Under New York law, equitable rescission is not available if it would be impossible or impractical for the court, through cancellation, to restore the *status quo* of the parties. *See, e.g., New Shows, S.A. de C.V. v. Don King Productions, Inc.*, 210 F.3d 355, 2000 WL 354214, at *2 (2d Cir. 2000); *Strategic Growth Int'l*, 2008 WL 4179235, at *5-6; *Rudman v. Cowles Commcn's, Inc.*, 330 N.Y.S.2d 33, 43 (N.Y. 1972). Here, rescission could not possibly return the parties who participated in the Exchange Offer to the *status quo*. Doing so would require not only unwinding the exchanges by noteholders who participated in the offer, it would also necessitate undoing GMAC's conversion into a bank holding company and nullifying the billions of dollars in equity investment in GMAC by the U.S. Treasury. The parties that would be affected by such drastic relief, including the participating noteholders and the United States, are not even before this Court, making such relief impossible here.

23

## VI.   Count V Does Not State A Claim For Equitable Subordination.

Count V of plaintiff's Complaint seeks equitable subordination of notes exchanged or sold pursuant to the Exchange Offer "to the priority status held before the Exchange Offers." (FAC, D.I. 65, ¶ 107). "Courts have recognized that equitable subordination is an unusual remedy which should be applied only in limited circumstances." *In re Submicron Sys. Corp.*, 291 B.R. 314, 327 (D. Del. 2003). This is not one of those limited circumstances, and plaintiff's claim here should be dismissed for two independent reasons.

*First*, the judicially created doctrine of equitable subordination, now codified in Section 510(c) of the Bankruptcy Code, is a bankruptcy remedy. *Submicron*, 291 B.R. at 327. Because the relief afforded is subordination of other creditors' rights in bankruptcy, equitable subordination is "an issue which can only be decided in a bankruptcy setting." *In re Poughkeepsie Hotel Assocs. Joint Venture*, 132 B.R. 287, 292 (Bankr. S.D.N.Y. 1991); *see also In re The Drexel Burnham Lambert Group, Inc.*, 1990 WL 302177 at *8 (Bankr. S.D.N.Y. Dec. 14, 1990) (bankruptcy court is the "proper forum to determine whether certain claims should be subordinated"). Here, GMAC is not in bankruptcy, and plaintiff asserts no claim to GMAC's assets in bankruptcy court.

*Second*, plaintiff fails to allege the essential elements for the remedy of equitable subordination. To state a claim, plaintiff must allege that the GMAC bondholders who participated in the Exchange Offer, and against whom equitable subordination would be effected, "engaged in some type of inequitable conduct." *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986 (3d Cir. 1998); *In re Submicron Sys.*,

24

291 B.R. at 327.[12]  To constitute inequitable conduct, the actions *by the allegedly preferred bondholders* must amount to "(1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; [or] (3) [their] use of the debtors as a mere instrumentality or alter ego." *In re Submicron Sys.*, 291 B.R. at 327-28; *see also In re 80 Nassau Assocs.*, 169 B.R. 832, 838 (Bankr. S.D.N.Y. 1994).  Plaintiff here alleges nothing about the conduct of the bondholders who participated in the Exchange Offer, much less that their conduct was fraudulent or otherwise inequitable.  Indeed, those bondholders are not parties to this action.  Accordingly, plaintiff's equitable subordination claim fails for this reason as well.

## CONCLUSION

For the reasons stated above, plaintiff's First Amended Class Action Complaint against GMAC should be dismissed with prejudice.

Of Counsel:

Robert J. Kopecky
Daniel E. Laytin
Jennifer W. Cowen
Rana Barakat
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
(312) 862-2000

Dated:  July 14, 2009

*Kelly E. Farnan*

Daniel A. Dreisbach (#2583)
Dreisbach@rlf.com
Lisa A. Schmidt (#3019)
Schmidt@rlf.com
Kelly E. Farnan (#4395)
Farnan@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
(302) 651-7700

*Attorneys for Defendant GMAC Inc.*

---

[12] An equitable subordination claim also requires plaintiffs to establish two other elements:  that the inequitable conduct at issue caused them injury, and that a grant of equitable subordination is consistent with other bankruptcy law.  *Citicorp Venture Capital*, 160 F.3d at 986-87; *In re Submicron Sys.*, 291 B.R. at 327.  Plaintiff here has alleged neither element. As discussed above, the value of plaintiff's SmartNotes has substantially increased because of the Bond Exchange.  And the inapplicability of the bankruptcy laws to GMAC precludes plaintiff from establishing that subordination is consistent with other bankruptcy laws.

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2009, I electronically filed the foregoing with the Clerk

of Court using CM/ECF which will send notification of such filing(s) to the following and which

has also been served as noted:

<u>**BY HAND DELIVERY AND E-MAIL:**</u>

Joel E. Friedlander
Sean M. Brennecke
Bouchard, Margules & Friedlander, P.A.
222 Delaware Avenue
Suite 1400
Wilmington, DE 19801

Kenneth J. Nachbar
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

I further certify that on July 14, 2009, the foregoing document was sent to the following

non-registered participants in the manner indicated:

<u>**BY E-MAIL:**</u>

Jonathan Rosenberg
Abby F. Rudzin
Asher L. Rivner
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

Kelly E. Farnan (#4395)

RLF1-3415405-1