IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| S. BLAKE MURCHISON, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | Case 1:09-cv-00169-SLR |
| GMAC LLC, T. K. DUGGAN, DOUGLAS A. HIRSCH, ROBERT W. SCULLY, LENARD B. TESSLER, MARK A. NEPORENT, FRANK W. BRUNO, SETH P. PLATTUS, RAY G. YOUNG, FREDERICK A. HENDERSON, MARK R. LANEVE, and WALTER G. BORST, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

Joel Friedlander (#3163)
Sean M. Brennecke (#4686)
BOUCHARD MARGULES & FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE  19801
(302) 573-3500
jfriedlander@bmf-law.com
sbrennecke@bmf-law.com
*Attorneys for Plaintiff*

OF COUNSEL:

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS LLP
Paul J. Geller
Jonathan M. Stein
Stuart A. Davidson
Cullin A. O'Brien
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
(561) 750-3000

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS LLP
Samuel H. Rudman
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100

RICHARD WALDEN
Walden Law Firm, PLLC
8201 Cantrell, Suite 315
Little Rock, AR 72227
(501) 907-7000

DATED:  August 31, 2009

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...........................................................................................................1

II.  STATEMENT OF FACTS ............................................................................................6

III.  ARGUMENT ................................................................................................................7

    A.  There Is No Pre-Suit Demand Barring Counts I, II and IV .....................................7

    B.  Plaintiff States a Claim for Breach of the Indenture .............................................10

        1.  GMAC's Own Offering Memorandum Negates GMAC's
            Contentions ............................................................................................11

            a.  Contention #1: GMAC's Interpretation of the Word
                "Guarantee".......................................................................11

            b.  Contention #2: GMAC's Characterization of the Nature of
                Security Underlying the New Notes ..............................................12

            c.  The Offering Memorandum Flatly Negates GMAC's
                Contentions ....................................................................13

            d.  GMAC's Contentions Defy Credulity, Apart from the
                Offering Memorandum ..................................................17

                (1)  The Notion that "Pledges" and "Liens" Do Not
                    Include the New Notes "Guarantee" is Wrong .................17

                (2)  The Notion that GMAC is not Responsible for the
                    Security of the New Notes is Wrong ................................19

    C.  Plaintiff States a Claim for Breach of the Implied Covenant of Good Faith
       and Fair Dealing......................................................................................................21

        1.  Plaintiff Alleges that GMAC's Conduct Violates An Express Term
            in the Indenture ......................................................................................21

        2.  Rule 8 Permits Plaintiff to Plead Breach of the Implied Covenant
            of Good Faith and Fair Dealing in the Alternative ....................................23

    D.  Plaintiff Properly Alleges a Claim Under the Trust Indenture Act .......................25

        1.  The Exchange Offers at Issue in *Mechala* ...............................................25

2.      The Parties' Arguments Regarding the Legality of the Exchange Offers ........................................................................................................26

3.      Judge Baer's Analysis..................................................................................27

4.      Application of *Mechala* ...........................................................................28

5.      GMAC Relies on Irrelevancies..................................................................29

E.      Plaintiff's Equitable Claims Have Merit................................................................30

F.      The Lawsuit Properly Establishes Liability for the Board Defendants ................33

IV.    CONCLUSION....................................................................................................34

TABLE OF AUTHORITIES

## CASES

*Bank of N.Y. Mellon v. Realogy Corp.*,
   C.A. No. 4200-VCL, 2008 WL 5259732 (Del. Ch. Dec. 18, 2008)...................4, 5, 18, 19

*Bano v. Union Carbide Corp.*,
   273 F.3d 120 (2d Cir. 2001)..............................................................................................33

*Bonham v. Coe*,
   292 N.Y.S. 423 (N.Y. App. Div. 1937) ...........................................................................30

*Callanan v. Powers*,
   92 N.E. 747 (N.Y. 1910)..............................................................................................32, 33

*Consol. Rock Prods. Co. v. Du Bois*,
   312 U.S. 510 (1941).........................................................................................................20

*Cruden v. Bank of N.Y.*,
   957 F.2d 961 (2d Cir. 1992)................................................................................................9

*Federated Strategic Income Fund v. Mechala Group Jamaica Ltd.*,
   No. 99 CIV 10517 HB, 1999 WL 993648 (S.D.N.Y. Nov. 02, 1999) ...................... *passim*

*Fourth Branch Assocs. Mechanicville v. Niagara Mohawk Power Corp.*,
   653 N.Y.S.2d 412 (N.Y. App. Div. 1997) .......................................................................21

*Great Plains Trust Co. v. Union Pac. R.R. Co.*,
   492 F.3d 986 (8th Cir. 2007) ...........................................................................................10

*Gurfein v. Sovereign Group*,
   826 F. Supp. 890 (E.D. Pa. 1993) ...................................................................................13

*Hackettstown Nat'l Bank v. D.G. Yuengling Brewing Co.*,
   74 F. 110 (2d Cir. 1896)...................................................................................................22

*Haywin Textile Prods., Inc. v. Int'l Fin. Inv. & Commerce Bank Ltd.*,
   152 F. Supp. 2d 409 (S.D.N.Y. 2001)..............................................................................16

*In re Bd. of Dirs. of Multicanal S.A.*,
   340 B.R. 154 (Bankr. S.D.N.Y. 2006).............................................................................22

*In re Kaiser Aluminum Corp.*,
   380 B.R. 344 (Bankr. D. Del. 2008) ..................................................................................9

*In re Oakwood Homes Corp.*,
   No. 02-13396(PJW), 2004 WL 2126514 (Bankr. D. Del. Sept. 22, 2004).........................9

*In re VMS Ltd. P'ship Sec. Litig.*,
803 F. Supp. 179 (N.D. Ill. 1992) .............................................................................13

*JPMorgan Chase Bank, N.A. v. IDW Group, LLC*,
No. 08 Civ. 9116(PGG), 2009 WL 321222 (S.D.N.Y. Feb. 09, 2009) .......................24, 25

*LaSalle Nat'l Bank v. Perelman*,
141 F. Supp. 2d 451 (D. Del. 2001)............................................................................34

*Libby v. L. J. Corp.*,
247 F.2d 78 (D.C. Cir. 1957) ....................................................................................22

*Limited, Inc. v. El Al Israel Airlines*,
No. 98 CIV 5651(LAP), 1999 WL 588290 (S.D.N.Y. Aug. 04, 1999)...........................31

*Mann v. Oppenheimer & Co.*,
517 A.2d 1056 (Del. 1986) .......................................................................................28

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
65 F.3d 1044 (2d Cir. 1995).....................................................................................10

*Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*,
No. 03 Civ. 5539(NRB), 2004 WL 1444868 (S.D.N.Y. June 25, 2004)..........................9

*Oaktree Capital Mgmt., LLC v. Spectrasite Holdings, Inc.*,
No. Civ.A. 02-548 JJF, 2002 WL 32173072 (D. Del. June 25, 2002) ........................3, 28

*Rebh v. Rotterdam Ventures Inc.*,
675 N.Y.S.2d 234 (N.Y. App. Div. 1998) ....................................................................16

*Ruckle v. Roto Am. Corp.*,
339 F.2d 24 (2d Cir. 1964)........................................................................................34

*Sakelaris v. Danikolas*,
No. 2:05-CV-158 PPS, 2006 WL 2644948 (N.D. Ind. Sept. 14, 2006)...........................31

*Semi-Tech Litig., LLC v. Bankers Trust Co.*,
272 F. Supp. 2d 319 (S.D.N.Y. 2003)....................................................................10, 34

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
88 F.R.D. 38 (S.D.N.Y. 1980) ................................................................................8, 9

*Starks v. Perloff Bros.*,
760 F.2d 52 (3d Cir. 1985)........................................................................................22

*Superintendent of Ins. v. Chase Manhattan Bank*,
840 N.Y.S.2d 479 (N.Y. App. Div. 2007) ...................................................................17

*T.V. Spano Bldg. Corp.* v. *Dep't of Natural Res. & Envtl. Controls*,
    628 A.2d 53 (Del. 1993) ...................................................................................33

*Townsend v. Columbia Operations*,
    667 F.2d 844 (9th Cir. 1982) ...........................................................................13

*U.S. Banknote Corp. v. De La Rue Ag*,
    No. 94 CIV. 9210(MGC), 1997 WL 580710 (S.D.N.Y. Sept. 18, 1997) .........................16

*UPIC & Co. v. Kinder-Care Learning Ctrs.*,
    793 F. Supp. 448 (S.D.N.Y. 1992)....................................................................10

*Van Kirk v. Campbell*,
    7 F.R.D. 231 (S.D.N.Y. 1946) .........................................................................31

*Wheaton v. Diversified Energy, LLC*,
    No. Civ.A. 03-CV-105, 2003 WL 23162404 (E.D. Pa. Dec. 16, 2003) .........................31

*Wing Ming Props.*, *Ltd. v. Mott Operating Corp.*,
    568 N.Y.S.2d 605 (N.Y. App. Div. 1991), *aff'd* 594 N.E. 603 (1991)...............................8

*Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*,
    341 F. Supp. 2d 258 (S.D.N.Y. 2004)...............................................................23

**STATUTES, RULES AND REGULATIONS**

The Trust Indenture Act of 1939, 15 U.S.C.§§ 77aaa, *et seq.* .............................. *passim*

Federal Rules of Civil Procedure
    Rule 8 ...............................................................................................5, 23
    Rule 8(a)(3)...............................................................................................23
    Rule 8(f) ...................................................................................................22
    Rule 12(b)(7)...............................................................................................30
    Rule 19 .......................................................................................................31
    Rule 19(a)...................................................................................................31
    Rule 19(b) ..................................................................................................31

**SECONDARY AUTHORITIES**

*Black's Law Dictionary* (9th ed. 2009)...................................................................4, 17

3A *Fletcher Cyc. Corp.* § 1135........................................................................33

Plaintiff S. Blake Murchison ("Plaintiff"), respectfully submits this response in opposition to the motions to dismiss, [D.I.s 70, 73], filed by defendant GMAC LLC ("GMAC"), and by GMAC's Board of Directors (hereinafter "Board Defendants"),T. K. Duggan, ("Duggan"), Douglas A. Hirsch ("Hirsch"), Robert W. Scully ("Scully"), Lenard B. Tessler ("Tessler"), Mark A. Neporent ("Neporent"), Frank W. Bruno ("Bruno"), Seth P. Plattus ("Plattus"), Ray G. Young ("Young"), Frederick A. Henderson ("Henderson"), Mark R. Laneve ("Laneve"), and Walter G. Borst ("Borst"). In support thereof, Plaintiff states:

## I.      INTRODUCTION

Plaintiff and a similarly-situated putative class of investors own GMAC Smart Notes debt securities. This lawsuit is about GMAC's illegal and patently discriminatory debt restructuring (hereinafter the "Exchange Offer") that has detrimentally affected GMAC's bond holders.  The Indenture for the Smart Notes expressly prohibits GMAC from subordinating the notes.  The Trust Indenture Act provides that the payment rights of holders of Smart Notes "shall not be impaired or affected without the consent of such holder."  15 U.S.C. § 77ppp(b).  Additionally, GMAC explicitly and unequivocally represented in a Form S-3 Statement filed with the U.S. Securities and Exchange Commission ("SEC") that the Smart Notes "will constitute [GMAC's] unsecured and unsubordinated indebtedness and will rank equally and ratably with all [GMAC's] other unsecured and unsubordinated indebtedness."  [D.I. 65, ¶4, Ex. A, at p. 9].  Nevertheless, as a result of the Exchange Offer at issue in this case, that representation is now false.  The Exchange Offer created new, superior bonds (hereinafter "New Notes" or "New Bonds") that subordinated the Smart Notes. Indeed, a spokeswoman from GMAC admitted this in a December 1, 2008 *Bloomberg* article, stating that Smart Notes investors "would be subordinated to the new notes" that were issued in the Exchange Offer.   [D.I. 65, ¶4, Ex. C].

Put simply, GMAC's debt restructuring has subordinated the priority status of the Smart Notes – something which GMAC represented in the Smart Notes Indenture and GMAC's own SEC filing that it would never do– and, in so doing, has materially harmed the investment of Plaintiff and the putative class of investors he seeks to represent.  For that reason, Plaintiff brings claims on behalf of all Smart Notes holders for Breach of Indenture, [D.I. 65, ¶¶80-85], (Count I), Breach of the Implied Covenant of Good Faith and Fair Dealing, [*id.*, ¶¶ 86-90], (Count II), Violation of the Trust Indenture Act, 15 U.S.C. §§77aaa, *et seq.*, [*id.*, ¶¶91-97], (Count III),  Equitable Rescission, [*id.*, ¶¶ 98-102], (Count IV), Equitable Subordination, [*id.*, ¶¶103-107], (Count V), and Liability of the Board Defendants, [*id.*,  ¶¶108-114], (Count VI).

Despite the straightforward nature of Plaintiff's claims that GMAC has unlawfully harmed the security interests of Smart Notes holders by subordinating the priority status of the Smart Notes to the New Notes *vis-à-vis* the Exchange Offer, the Defendants have filed motions to dismiss the case.  GMAC's motion attempts to attack each of Plaintiff's claims, while the Board Defendants contend that they are generally immune from a suit against Plaintiff in their capacity as directors.

Defendants' briefs ignore the falsity of GMAC's S-3 registration statement, ignore the text of GMAC's Offering Memorandum for the New Notes, and ignore case law under the Trust Indenture Act that is directly on point.  The significance of Defendants' neglect to confront the false S-3 registration statement cannot be overstated.  When GMAC sold the Smart Notes to its investors it promised that the Smart Notes would be "unsubordinated."  Yet, as a consequence of the Exchange Offers, that promise is now false.  On its own, the false S-3 registration statement proves the merits of Plaintiff's claims.  Defendants' glaring neglect to address this vitiates the entirety of their respective motions.

Defendants also neglect to address legal authorities that confront the very same issues raised in this litigation. For instance, regarding Plaintiff's claim under the Trust Indenture Act, GMAC contends that "case law on the [Trust Indenture Act] is sparse." [D.I. 70, at p. 16]. But rather than discussing that case law, such as the factually indistinguishable *Federated Strategic Income Fund v. Mechala Group Jamaica Ltd.*, No. 99 CIV 10517 HB, 1999 WL 993648, at *1 (S.D.N.Y. Nov. 02, 1999), GMAC ignores it. The rule set forth in *Mechala* is that improper debt subordination, in and of itself, states a cause of action under the Trust Indenture Act. *See also Oaktree Capital Mgmt., LLC v. Spectrasite Holdings, Inc.*, No. Civ.A. 02-548 JJF, 2002 WL 32173072, at *4 (D. Del. June 25, 2002) ("Should Defendants file a bankruptcy action, a court may find that the Tender Offer Transactions, entered into at a time near the bankruptcy, impaired the rights of the Indentures by incurring significant senior debt."). GMAC has no answer to *Mechala*, *Spectrasite*, or the proposition of law for which those cases stand.

Nor does GMAC rebut the straightforward factual allegation that the Exchange Offer has subordinated Plaintiff's Smart Notes. GMAC spokeswoman admitted that fact, and GMAC now contends that GMAC's admission about the subordination of the Smart Notes by the New Notes has "no legal effect." [D.I. 70, at p. 19 n.11] In other words, GMAC is trying to rebut Plaintiff's Trust Indenture Act claim by manufacturing a disputed issue of fact. Indeed, GMAC attempts to inject factual issues that are both disputed and irrelevant – by creating and attaching to its brief a chart purporting to depict price data for the Smart Notes since January 1, 1900 (an impossibility) and extending months after the challenged Exchange Offer. *Mechala* and related case law provide no warrant for defending an imposed subordination of payment obligations by looking at price data at a time before or after the forced subordination.

GMAC's attacks on Plaintiff's other claims also rely on ignoring key facts. GMAC contends that Plaintiff has not stated a cause of action for breach of the Indenture, which generally proscribes "liens" and "pledges" on the Smart Notes.  According to GMAC, the New Notes are secured by some lesser "guarantee"  GMAC also contends that GMAC's subsidiaries, and not GMAC itself, are responsible for the security interest in New Notes.  But GMAC's own disclosure document demonstrates that GMAC's position is a sham.

GMAC's source for its characterization of the New Notes is a Form 8-K that merely mentions the Exchange Offer.  GMAC does not cite or quote from its own Offering Memorandum for the New Notes – the disclosure document that describes the New Notes in detail.  GMAC's Offering Memorandum completely contradicts the characterization of the New Notes GMAC makes in its motion to dismiss.  The Offering Memorandum makes explicitly clear that the New Notes were issued by GMAC and that GMAC is responsible for the security of the New Notes.  GMAC can hardly obtain dismissal by avoiding the plain language of its own Offering Memorandum, and by relying instead on a tortured and fallacious analysis of the word "guarantee" contained in its Form 8-K.  Perhaps GMAC thought it could pretend that the Offering Memorandum does not exist or that Plaintiff had not located it – even though it is publicly available on the Internet.

GMAC's semantic gambit that a "guarantee" is somehow not a "lien" or a "pledge" is tortured, putting aside the fact that the Offering Memorandum shows it to be false.  *Black's Law Dictionary*, case law, and the Indenture itself all show why the term "guarantee" is subsumed within generic terms like "lien" or "pledge."  Moreover, the rule set forth in another leading case involving the same issues at play here (which GMAC also neglects to acknowledge), *Bank of N.Y. Mellon v. Realogy Corp.*, C.A. No. 4200-VCL, 2008 WL 5259732, at *1 (Del. Ch. Dec. 18, 2008), demonstrates why GMAC's reading of the Indenture is so tortured.  In *Realogy*, the debt

subordination was not consistent with the indenture because the construction of the term "lien" prohibited the subordination, just as it does here.

GMAC also contends that Plaintiff should have instituted a 60 day pre-suit demand procedure before bringing claims under the Indenture when, in fact, the Indenture holds inviolate Plaintiff's right to bring an action respecting the impairment of the payment obligation:

> *[T]he right of the holder of any Note to receive payment of the principle of (and premium, if any) and interest, if any, on such Note, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder*.

[D.I. 71-2, at p. 56].[1] Not only is GMAC's position contrary to this plain language in the Indenture, it certainly cannot, as a matter of law, be reconciled at this pleading stage.  Case law is also clear that it would be inequitable, as a matter of law, to require a pre-suit demand anyway given the fact that GMAC has been on notice of Plaintiff's lawsuit since March 13, 2009 – and well over the 60 days of notice GMAC purports to desire — and has not chosen to correct the wrongs alleged therein. Indeed, a legion of courts refuse to enforce pre-suit demand procedures when Trust Indenture Act claims, just like Plaintiff's claim here, are at issue.

GMAC also attempts to attack Plaintiff's claim for breach of the implied covenant of good faith and fair dealing by contending that Plaintiff has not alleged a violation of an express contractual term and, alternatively, that Plaintiff's claim is somehow improperly duplicative of Plaintiff's breach of indenture count.  But, as stated throughout this brief, Plaintiff's contractual claim is founded on the express provision in the Indenture for the Smart Notes that prohibits their subordination.  Moreover, Rule 8 permits Plaintiff to simultaneously plead a claim for breach of the implied covenant as well as breach of the Indenture, even if they were identical – which they are not.

---

[1]      Emphasis is added and citations and quotations are omitted unless otherwise noted.

As with the other claims, GMAC also raises factual questions regarding Plaintiff's equitable claims that cannot be determined at this pleading stage.  That is, GMAC's position is that the equitable claims should be dismissed because the holders of the New Notes and the United States Department of Treasury have not been named as parties.  Not only does GMAC fail to establish that they are indispensible parties, case law is clear that the analysis cannot be determined at this pleading stage.

As for the Board Defendants, they collectively neglect to acknowledge the doctrine that an individual can be personally liable for all torts which that individual committed, regardless of whether that person may have acted as an agent or under the direction of another.  This doctrine applies to the Board Defendants and holds them responsible for GMAC's tortious acts in the Exchange Offer.  For that reason, the Board Defendants' contentions regarding the lack of any privity of contract between themselves and the holders of the Smart Notes, their lack of fiduciary duties to the Smart Notes holders, and the no action clause in the Smart Notes have no bearing on Plaintiff's claim against them.  Put simply, were it not for the Board Defendants, GMAC would not have violated the law.

Therefore, for the reasons more fully stated herein this Court should deny the Defendants' motions to dismiss in their entirety.

## II.    STATEMENT OF FACTS

The facts in this litigation are straightforward.  Since 1996, GMAC had issued series of debt securities called Smart Notes, including Plaintiff's Smart Notes, pursuant to a uniform Indenture. [D.I. 65, ¶¶32-43].  The Indenture prohibits the subordination of the Smart Notes. [*Id*.].  In fact, the Form S-3 Statement for the Smart Notes represented that the Smart Notes "will constitute [GMAC's] unsecured and unsubordinated indebtedness and will rank equally and ratably with all [GMAC's] other unsecured and unsubordinated indebtedness." [*Id*., ¶44].

6

Facing insolvency, on November 20, 2008, GMAC commenced the Exchange Offer, which allowed certain GMAC note holders to exchange their existing notes for either cash, New Notes, or preferred stock. [*Id*., ¶45]. Not only did GMAC exclude Smart Notes holders from participating in the Exchange Offer, the New Notes issued thereto subordinated the Smart Notes. [*Id*., ¶¶46-60]. Indeed, in a December 1, 2008 *Bloomberg* article titled, "GMAC Puts Individuals After Institutions in Bond Plan," GMAC's spokeswoman, Gina Proia, unequivocally stated that Smart Notes investors "***would be subordinated to the new notes***." [*Id*., ¶49].

As a result of this material harm to the Smart Notes, Plaintiff brings this lawsuit for declaratory and other relief, which was first filed on March 13, 2009 and later amended on June 11, 2009. [D.I.s 1, 65].

## III.   ARGUMENT

### A.   There Is No Pre-Suit Demand Barring Counts I, II and IV

GMAC contends that Section 6.04 of the Smart Notes Indenture requires Plaintiff to first institute a pre-suit demand procedure before bringing his claims for breach of indenture, breach of the covenant of good faith and fair dealing, and equitable rescission, Counts I, II, and IV in his lawsuit. [D.I. 70, at pp. 9-10]. GMAC is wrong.

GMAC neglects to address the language immediately ***following*** the portion of Section 6.04 GMAC cites:

> [I]t being understood and intended, and being expressly covenanted by the taker and holder of every Note with every other taker and holder and the Trustee, that ***no one or more holders of Notes of any series, shall have any right*** in any manner whatever by virtue or by availing himself of any provision of this Indenture to affect, disturb or prejudice the rights of any other holder of Notes of such series, or to obtain or seek to obtain priority over or preference to any other such holder or to enforce any right under this Indenture, ***except*** in the manner herein provided and ***for the equal, ratable and common benefit of all holders of Notes of such series***. For the protection and enforcement of the provisions of this Section, ***each and every Noteholder*** and the Trustee ***shall be entitled to such relief as can be given either at law or in equity***.

> Notwithstanding any other provisions in this Indenture, however, ***the right of the holder of any Note to receive payment of the principle of (and premium, if any) and interest, if any, on such Note … or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder***.

[D.I. 71-2, at p. 56].

These passages are subsequent to and serve as an exception to the preceding language regarding a pre-suit demand that GMAC cites.  Moreover, the unfair subordination at issue in the debt restructuring addressed in Plaintiff's lawsuit is exactly the type of wrongful conduct contemplated in these passages.  Plaintiff seeks the "equal, ratable and common benefit" for all Smart Notes holders because the subordination of the Smart Notes affects all holders' right "to receive payment of the principle of (and premium, if any) and interest, if any" on the Smart Notes since, in direct contravention of what the registration statement for the Smart Notes guaranteed, the Smart Notes have been subordinated and will now cede to GMAC debt obligations to which the Smart Notes previously would not have ceded.  Put differently, the Indenture itself defines this exact lawsuit as an exempt from any pre-suit demand.[2]

Moreover, to the extent that there would be any ambiguity about the scope of the pre-suit demand language GMAC cites, it could not be resolved on the pleadings alone and would require evidence that is extrinsic to the complaint.  *See*, *e.g.*, *Wing Ming Props.*, *Ltd. v. Mott Operating Corp.*, 568 N.Y.S.2d 605, 606 (N.Y. App. Div. 1991), *aff'd* 594 N.E. 603 (1991) (summary judgment review and extrinsic evidence used to determine indenture); *Sharon Steel Corp. v. Chase*

---

[2]     The portion of Section 6.04 that GMAC contends requires a pre-suit demand is not only qualified by the passages cited above, but also by Section 10.02, which provides, among other things, that GMAC shall not "impair the right to institute enforcement of any such payment on or after the stated maturity thereof (or, in the case of redemption, on or after the redemption date therefor)," without the consent of the Smart Notes holder.  [D.I. 71-2, at p. 71].

*Manhattan Bank, N.A.*, 88 F.R.D. 38, 43 (S.D.N.Y. 1980) ("The provisions of the Indentures are not 'wholly unambiguous'; Sharon therefore has a right to 'present oral testimony or other extrinsic evidence at trial to aid in interpreting' those provisions."); *In re Kaiser Aluminum Corp.*, 380 B.R. 344, 247 (Bankr. D. Del. 2008) ("Reviewing the decision of the Bankruptcy Court in light of the applicable standard of review and the governing legal principles, the Court concludes that the Bankruptcy Court did not err in its interpretation of the 1993 Indenture and did not err in considering extrinsic evidence to reach that interpretation."); *In re Oakwood Homes Corp.*, No. 02-13396(PJW), 2004 WL 2126514, at *4 (Bankr. D. Del. Sept. 22, 2004) ("For purposes of the summary judgment motion, I simply conclude that Babson asserts a claim that is not barred by the no-action clause of the PSA.").

More importantly, the Defendants have been on notice of Plaintiff's claims since March 13, 2009, much more than the 60 days GMAC purports to seek, and it is crystal clear that any pre-suit notice would have had and will have no effect on the Defendants given their responses to the lawsuit. For that reason, and beyond the fact that extrinsic evidence would be required to follow GMAC's interpretation of the Indenture as it relates to pre-suit notice, it would be otherwise inequitable to enforce a pre-suit notice now. *See Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*, No. 03 Civ. 5539(NRB), 2004 WL 1444868, at *5 (S.D.N.Y. June 25, 2004) ("Shenkman is thus not shielded from suit in this circumstance. By suing Shenkman and JPMC, plaintiff is not trying to avoid or circumvent other noteholders' priority of payment. Accordingly, the 'no action' clause in the Indenture is simply inapplicable here. Plaintiff is entitled to bring this suit.").

Indeed, courts routinely refuse to enforce "limitation on suits" provisions where Trust Indenture Act claims are at issue. *See*, *e.g.*, *Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir. 1992) ("Because the claims against the Trustees are not for non-payment of principal or interest as

such, but rather assert breaches of the Trust Indenture Act and the Indentures, [the "limitation on suits" provision] is irrelevant in assessing when plaintiffs' causes of action against the Trustees accrued."); *UPIC & Co. v. Kinder-Care Learning Ctrs.*, 793 F. Supp. 448, 454-55 (S.D.N.Y. 1992) (holding that "limitation on suits" provision "has no applicability to actions brought under [the Trust Indenture Act]); *Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 991 (8th Cir. 2007) ("The question is whether the no-action clause or the [Trust Indenture Act] is controlling with respect to the annual interest owed on the debentures. We hold that [the Trust Indenture Act] grants Great Plains the absolute right to sue for unpaid interest without having to first comply with the no-action clause."); *Semi-Tech Litig., LLC v. Bankers Trust Co.*, 272 F. Supp. 2d 319, 329 n.51 (S.D.N.Y. 2003) (stating that "limitation on suits" clause would not have barred Trust Indenture Act claim); *accord McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1051 (2d Cir. 1995) ("the district court properly found that actions based on federal securities laws may not be precluded by the no-action clause."). Accordingly, this Court should similarly refuse to enforce any pre-suit demand.

### B.    Plaintiff States a Claim for Breach of the Indenture

GMAC contends that Plaintiff does not allege a cause of action on Count I, breach of the Indenture. [D.I. 70, at pp. 11-14]. GMAC is wrong.

As stated above, Section 6.04 of the Indenture holds inviolate Plaintiff's right to "the equal, ratable and common benefit of all holders" of Smart Notes. Section 12.01 of the Indenture goes on to proscribe "Limitations on Liens" and provides:

> *[T]he Company will not at any time pledge or otherwise subject to any lien* any of its property or assets *without* thereby expressly securing the demand punctual payment of the principal of and interest on the Notes *equally and ratably with any and all other obligations and indebtedness secured by such pledge or other lien,* so long as any such other obligations and indebtedness shall be so secured, and the Company covenants that if and when any such pledge or other lien is created.

[D.I.s 65, ¶41; 71-2, at p. 74].

To be sure, the Form S-3 registration statement further codifies these contractual provisions by representing that the Smart Notes "will constitute [GMAC's] unsecured and unsubordinated indebtedness and will rank equally and ratably with all [GMAC's] other unsecured and unsubordinated indebtedness." [D.I. 65, ¶4, Ex. A, at p. 9].

Therefore, because GMAC's capital restructuring subordinates the Smart Notes and falsifies GMAC's representation regarding subordination in the Form S-3 registration statement, GMAC has breached the Indenture.  Indeed, as stated above, GMAC's own spokeswoman confirms Plaintiff's breach of indenture claim by stating to *Bloomberg* that the Exchange Offer subordinated the Smart Notes.

GMAC has two responses to this allegation.  First, GMAC contends that it has not breached Section 12.01 because the Exchange Offer granted "guarantees" for the New Notes, which, according to GMAC, are not the same thing as the terms "pledges" and "liens" contained in Section 12.01.  Second, GMAC contends that it has not breached Section 12.01 because only GMAC's subsidiaries, not GMAC itself, have created guarantees in the Exchange Offer.  GMAC bases each response on its interpretation of the word "guarantee" in a Form 8-K filing.  However, GMAC's contentions are completely contradicted by the Offering Memorandum – the document that actually defines the nature of the security underlying the New Notes:

     **1.**      **GMAC's Own Offering Memorandum Negates GMAC's Contentions**

           **a.**      **Contention #1: GMAC's Interpretation of the Word "Guarantee"**

GMAC contends that the subordination of the Smart Notes has not breached Section 12.01 because:

> The Exchange Offer does not involve a pledge or lien of any GMAC property. Instead, as the Form 8-K cited in the Complaint makes clear, the additional protection provided to recipients of the new notes was in the form of unsecured guarantees issued by several GMAC subsidiaries. A **_guarantee_** is not a **_pledge_** or a **_lien_**. Pledges and liens provide their recipients with either a security interest or "privilege of retention" in particular property of a debtor. A guarantee, on the other hand, is merely a contractual promise of the guarantor to pay the debtor's obligations upon default. Here, plaintiff does not (and cannot) allege that the **_guarantee_** provided in connection with the Exchange Offer encumbered any property of either GMAC or its subsidiaries.

[D.I. 70, at p.12].

In other words, GMAC is relying on the semantic gambit that because the Exchange Offer (according to GMAC) provided a "guarantee" for the New Notes, not a "pledge" or a "lien," the Exchange Offer does not breach the Indenture for, or otherwise subordinate, the Smart Notes. Put even differently, GMAC takes the position that the following language in Section 12.01 does not cover the "guarantee" to the New Notes made *vis-à-vis* the Exchange Offer:

> [T]he Company will not at any time pledge or otherwise subject to any lien any of its property or assets without thereby expressly securing the demand punctual payment of the principal of and interest on the Notes **_equally and ratably with any and all other obligations and indebtedness secured by such pledge or other lien,_** so long as any such other obligations and indebtedness shall be so secured, and the Company covenants that if and when any such pledge or other lien is created.

[D.I.s 65, ¶41; 71-2, at p. 74].

### b.     Contention #2: GMAC's Characterization of the Nature of Security Underlying the New Notes

GMAC also contends that it has not breached Section 12.01 of the Smart Notes Indenture because:

> Section 12.01 only prevents "the Company" – defined as GMAC – from taking certain actions. Plaintiff does not allege that GMAC provided any guarantee or additional security to recipients of the new notes. Rather, as explained above, participants in the Exchange Offer received guarantees from certain GMAC subsidiaries. This obligation is separate and distinct from the obligations of GMAC to its debtholders. Nothing in Section 12.01 prohibits GMAC's subsidiaries from providing such guarantees, and plaintiff's clam that the Exchange Offer violated Section 12.01 fails as a matter of law.

[D.I. 70, at pp. 12-13].

> ### c.      The Offering Memorandum Flatly Negates GMAC's Contentions

Contrary to GMAC's interpretation of the word "guarantee" that appears on the Form 8-K, GMAC's own Offering Memorandum actually defines the nature of the security underlying the New Notes.   The Offering Memorandum is explicitly referenced in and incorporated into Plaintiff's complaint.  [D.I. 65, ¶47]; *accord Townsend v. Columbia Operations*, 667 F.2d 844, 848 (9th Cir. 1982) (describing offering memoranda as "in substance part of [the] pleading"); *In re VMS Ltd. P'ship Sec. Litig.*, 803 F. Supp. 179, 191-96 (N.D. Ill. 1992) (taking judicial notice of offering memorandum in reviewing motion to dismiss); *Gurfein v. Sovereign Group*, 826 F. Supp. 890, 898 (E.D. Pa. 1993) (same). And because GMAC neglects to acknowledge its existence, Plaintiff attaches a copy to the Declaration of Sean M. Brennecke, Esq, filed contemporaneously herewith (hereinafter "Offering Memorandum at __"), and it is also available on the Internet by typing in the search query "GMAC offering memorandum" in the Yahoo! search engine. *See* http://www.crystal.com.mt/pages/pdf.asp?d=gmac- (last visited August 31, 2009).

To wit, the Offering Memorandum unequivocally states that GMAC is the "Issuer," [Offering Memorandum at pp. 20, 23], for two series of New Notes issued in the Exchange Offer and unequivocally describes the New Notes as GMAC debt.  For instance, for the "New Guaranteed Notes," the offering document states:

> ***The new guaranteed notes will constitute senior unsecured indebtedness of GMAC.***
>
> The new guaranteed notes will:
>
> • rank equally in right of payment with all of GMAC's existing and future senior indebtedness;
>
> • rank senior in right of payment to all of GMAC's existing and future subordinated indebtedness;

• be effectively subordinated to GMAC's existing and future secured indebtedness to the extent of the value of the assets securing such indebtedness; and

• be structurally subordinated to all of the existing and future indebtedness and other liabilities of GMAC's subsidiaries (other than the note guarantors) to the extent of the value of the assets of such subsidiaries.

As of September 30, 2008, GMAC on a consolidated basis had approximately $160.6 billion of total debt outstanding, consisting of $72.6 billion and $88.0 billion of unsecured and secured debt, respectively. As of September 30, 2008, GMAC LLC on a stand alone basis had approximately $54.2 billion of total debt outstanding, all of which was unsecured.

[Offering Memorandum at p. 20].

Likewise, for the "New Subordinated Notes," the Offering Memorandum states:

**_The new subordinated notes will constitute subordinated unsecured indebtedness of GMAC_.**

The new subordinated notes will:

• rank equally in right of payment with certain of GMAC's existing and future subordinated indebtedness, including all other debt securities issued pursuant to the indenture under which the new subordinated notes will be issued. Because the subordination provisions in various series of subordinated debt securities that GMAC may issue in the future may differ, the holders of the new subordinated notes may receive less, ratably, than holders of some of our other series of subordinated debt securities;

• be subordinated in right of payment to GMAC's existing and future senior indebtedness;

• rank senior in right of payment to all of GMAC's future indebtedness that is, by its terms, expressly subordinated in right of payment to the new subordinated notes;

• be effectively subordinated to GMAC's existing and future secured indebtedness to the extent of the value of the assets securing such indebtedness; and

• be structurally subordinated to all of the existing and future indebtedness and other liabilities of GMAC's subsidiaries to the extent of the value of the assets of such subsidiaries.

As of September 30, 2008, GMAC on a consolidated basis had approximately $160.6 billion of total debt outstanding, consisting of $72.6 billion and $88.0 billion of unsecured and secured debt, respectively. As of September 30, 2008, GMAC LLC on a stand alone basis had approximately $54.2 billion of total debt outstanding, all of which was unsecured.

14

[Offering Memorandum at p. 23].

The Offering Memorandum also goes onto explain how GMAC is responsible for the security of the New Notes, which is diametrically opposed to GMAC's contentions in its motion to dismiss.  For the "New Guaranteed Notes," the Offering Memorandum states:

> The indenture contains covenants that, among other things,
>
> • limit GMAC's ability to:
>
>> o grant liens on its assets; and
>>
>> o merge or consolidate, or to transfer or dispose of all or substantially all of its assets; and
>
> • require GMAC to provide certain periodic and interim reports to the holders of the new guaranteed notes; and
>
> GMAC will also be required to use the net cash proceeds of any sale, disposal or transfer of the equity interests of any note guarantor held by GMAC in a transaction following which GMAC ceases to own a majority of the equity interests of such note guarantor to make an investment in one or more note guarantors, including any subsidiary of GMAC that becomes a note guarantor as described in "Description of Notes—Certain Covenants—Limitation on Sale of Equity Interests in Note Guarantors."

[Offering Memorandum at p. 21].

For the "New Subordinated Notes," the Offering Memorandum similarly describes GMAC responsibility for the security interest of the notes:

> The indenture contains covenants that, among other things,
>
> • limit GMAC's ability to merge or consolidate, or to transfer or dispose of all or substantially all of its assets, and
>
> • require GMAC to provide certain periodic and interim reports to the holders of the new subordinated notes.

[Offering Memorandum at p. 24].

Therefore, the Offering Memorandum flatly negates GMAC's contentions and, at the very least, raises a disputed issue of fact that cannot be resolved at this pleading stage – namely, the

disputed fact of whether GMAC has altered the terms of the New Notes in the briefing before this Court such that it now has a duty to supplement the Offering Memorandum accordingly or to otherwise put investors in the New Notes on notice of GMAC's novel description of the character of the New Notes.  *See*, *e.g*., *Rebh v. Rotterdam Ventures In*c., 675 N.Y.S.2d 234, 236 (N.Y. App. Div. 1998) ("These factors, considered in conjunction with the timing and other circumstances surrounding defendant's purchase and later foreclosure of LGV's mortgage-which left the latter judgment proof, while enabling defendant to transfer LGV's assets to another of defendant's subsidiaries, which apparently has carried on in LGV's shoes-raise a question of fact as to whether defendant completely controlled and dominated LGV, in furtherance of 'a scheme to denude the subsidiary of its assets in order to render it unable to honor its obligations resulting in a loss to plaintiff[s].'"); *Haywin Textile Prods., Inc. v. Int'l Fin. Inv. & Commerce Bank Ltd*., 152 F. Supp. 2d 409, 413 (S.D.N.Y. 2001) ("Whether the transfer of control of Azmat is sufficient to impose liability on IFIC as a successor-in-interest is obviously a matter which will require additional factual information. And while IFIC downplays the expansiveness of IFIC's liability by making certain arguments regarding the circumstances surrounding the transaction, those arguments go beyond the scope of a motion to dismiss."); *U.S. Banknote Corp. v. De La Rue Ag*, No. 94 CIV. 9210(MGC), 1997 WL 580710, at *4 (S.D.N.Y. Sept. 18, 1997) ("The determination of whether the facts of a particular case justify disregard of the corporate form 'is the sort of determination usually made by a jury because it is so fact specific.' In this case, Banknote has pointed to sufficient evidence to raise a genuine issue of fact as to whether De La Rue exercised enough domination and control over TDLR to be held liable for the breach of the Agreement.").

16

> **d.    GMAC's Contentions Defy Credulity, Apart from the Offering Memorandum**
>
> **(1)    The Notion that "Pledges" and "Liens" Do Not Include the New Notes "Guarantee" is Wrong**

Regardless, GMAC's position is illogical because in other contexts the term "guarantee" is synonymous with the terms "pledge" and "lien." *Black's Law Dictionary* makes this clear generally defining the term "lien" as "A legal right or interest that a creditor has in another's property, lasting usually until a debt or duty that is secures is satisfied." *Black's Law Dictionary* 1006 (9th ed. 2009). Likewise, *Black's* also defines the word "pledge" as "A formal promise or undertaking." *Id.*, 1272. *Black's* further states that a "guarantee" is defined as "Something given or existing as security, such as to fulfill a future engagement or a condition subsequent." *Id.*, 772-73. The definitions of these terms overlap in this case. *See*, *e.g.*, *Superintendent of Ins. v. Chase Manhattan Bank*, 840 N.Y.S.2d 479, 481 (N.Y. App. Div. 2007) ("Such notes, in turn, were secured by stock pledges and other guarantees.").

The plain language of Section 12.01 also makes this clear given the clause "otherwise subject to any lien," which common sense includes a "guarantee." Indeed, the Indenture requires construction of the contract in accordance with the definitions set forth in the Trust Indenture Act, [D.I. 71-2, at p. 22], and the act broadly lumps all debt obligations under one concept of an "obligor." 15 U.S.C. §77ccc(12).[3] It would, therefore, do violence to the Indenture to read Section 12.01 as excluding "guarantees."

---

[3]    "The term 'obligor', when used with respect to any such indenture security, means every person (including a guarantor) who is liable thereon, and, if such security is a certificate of interest or participation, such term means also every person (including a guarantor) who is liable upon the security or securities in which such certificate evidences an interest or participation; but such term shall not include the trustee under an indenture under which certificates of interest or participation, equipment trust certificates, or like securities are outstanding." *Id.*

Furthermore, the proceedings in *Realogy*, *supra*, demonstrate why GMAC's interpretation of the word "guarantee" *vis-à-vis* the Indenture is tortured.  In *Realogy*, the trustee of certain bond holders sued the defendant company as a result of the company's proposed exchange offers.  The company was "offering holders of the [company's] unsecured indebtedness the opportunity to exchange notes for participation in a new term loan facility secured by a second lien on its assets." *Id.*, at *1.  Certain bond holders, *via* their trustee, objected "to the terms of the exchange offer because it discriminates against them in favor of holders of other classes of unsecured notes that pay interest in cash . . . [and] would violate the terms of that indenture."  *Id.*

The issue in the case was whether the exchange offers constituted a "Permitted Lien" under the terms of the bond indentures, and "whether the proposed borrowing satisfies the definition of Permitted Refinancing Indebtedness found in the bank credit agreement incorporated by reference into that indenture."  *Id.*

Vice Chancellor Lamb first noted that the indentures restricted the defendant company's "right to grant or suffer the existence of liens."  *Id*. at *4.  Specifically, he found that to "the extent that liens are created in favor of indebtedness which is *pari passu* to the [Notes, the Notes] must be granted equal and ratable liens."  *Id*., at *4.

Vice Chancellor Lamb then equated the term "guarantee" with the term "security," interpreted the plain language of the documents, and found that the exchange offers were not Permitted Liens because the documents prohibited "the granting of greater security to the Permitted Refinancing Indebtedness than the indebtedness being refinanced had."  *Id*. at *9. Therefore, the court concluded:

> As a result, the refinancing of the Senior Notes with Second Lien Term Loans does not qualify as Permitted Refinancing Indebtedness. . . . The creation of these liens is therefore not exempted from the requirements of Section 4.12 of the Indenture.  As

such, the proposed transaction if consummated will constitute a breach of the Indenture.

*Id.* at \*10.

Given *Realogy*, and for the other reasons stated above, this Court should similarly reject GMAC's position on the term "guarantee."

**(2)    The Notion that GMAC is not Responsible for
the Security of the New Notes is Wrong**

GMAC's contention that it is somehow not responsible for the security underlying the New Notes is also wrong because Plaintiff's allegations in the lawsuit and ***GMAC's own briefing*** expressly indicate that it would be an undisputed material fact that GMAC – not its subsidiaries – is obliged for the debt of the new notes.

That is, ***GMAC is the issuer of the New Notes***.  To be sure, the four corners of Plaintiff's lawsuit allege that GMAC is responsible for the Exchange Offers and orchestrated the subordination of the Smart Notes to the New Notes that were issued therein.  [D.I. 65,¶¶45-68].  Indeed, GMAC concedes this very point by making clear that GMAC was behind the Exchange Offers, not that somehow it was the work of GMAC's subsidiaries:

> In November 2008, in order to strengthen its balance sheet in the face of a capital and liquidity crisis, ***GMAC LLC ("GMAC") commenced a private exchange and tender offer to holders of some of its outstanding unsecured debt***.  That offer was an essential part of ***GMAC's effort*** to become a bank holding company, which required GMAC to increase its regulatory capital and reduce its outstanding debt.

[D.I. 70, at p. 1].

In fact, GMAC goes on to explicitly impute ownership of the security for the New Notes:

> GMAC needed to reduce its outstanding debt, among other things.  Thus, as disclosed in its November 20, 2008 Form 8-K, GMAC commenced a private exchange and tender offer to holders of certain series of outstanding unsecured debt which, if successful, would "increase GMAC's capital level while reducing the amount of its outstanding debt," and would generate a "significant portion" of additional capital as required by the Federal Reserve.

19

Under the terms of the exchange and tender offer commenced on November 20, 2008 (the "Exchange Offer"), "eligible holders" of certain GMAC notes (not including the SmartNotes) were given the opportunity to sell or exchange their notes for either cash or a combination of new unsecured, unsubordinated notes and preferred stock (the preferred stock to be issued by a wholly-owned subsidiary of GMAC). The amount of cash, the principal amount of the new notes, and the amount of the preferred stock varied depending on the maturity of the old notes, but in every case reflected a discount from the face amount of the old notes. The new notes issued pursuant to the Exchange Offer were guaranteed, on a joint and several basis, by five GMAC subsidiaries. *As explained in GMAC's Form 8-K, "[t]he note guarantees will rank senior to all subordinated debt of such note guarantor" – i.e., senior to the subordinated debt of the subsidiaries – but not senior to any other debt of GMAC."*

[D.I. 70, at p. 7]. Thus, GMAC states in no plainer terms that debt of the subsidiaries is "other debt

of GMAC." Indeed, GMAC's own description of the Exchange Offer mimics the precise scenario

reviewed by the United States Supreme Court in *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510,

523-24 (1941):

So far as the ability of the bondholders of Union and Consumers to reach the assets of Consolidated on claims of the kind covered by the operation agreement is concerned, there is another and more direct route which reaches the same end. There has been a unified operation of those several properties by Consolidated pursuant to the operating agreement. That operation not only resulted in extensive commingling of assets. All management functions of the several companies were assumed by Consolidated. The subsidiaries abdicated. Consolidated operated them as mere departments of its own business. Not even the formalities of separate corporate organizations were observed, except in minor particulars such as the maintenance of certain separate accounts. In view of these facts, Consolidated is in no position to claim that its assets are insulated from such claims of creditors of the subsidiaries. To the contrary, it is well settled that where a holding company directly intervenes in the management of its subsidiaries so as to treat them as mere departments of its own enterprise, it is responsible for the obligations of those subsidiaries incurred or arising during its management.

For GMAC to take a 180-degree turn to disclaim any responsibility for the New Notes is

absurd. Plaintiff alleges – and GMAC concedes – that the buck stops with GMAC on the Exchange

Offers and the New Notes. GMAC assertion to the contrary should be disregarded in light of

Plaintiff's allegations and the excerpts from GMAC's own briefing and the Offering Memorandum

cited immediately above and, at best, GMAC's contrary assertion creates an issue of fact about

whether GMAC is obliged for the debt issued in the Exchange Offer that cannot, as a matter of law, be determined at this pleading stage.

### C.     Plaintiff States a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

GMAC contends that Plaintiff does not state a cause of action under the implied covenant of good faith and fair dealing for two reasons, both of which are wrong and addressed in turn:

#### 1.     Plaintiff Alleges that GMAC's Conduct Violates An Express Term in the Indenture

First, GMAC posits that "plaintiff has not alleged that the Exchange Offer violates any express Indenture term, but instead asks the Court to read into the Indenture a term prohibiting GMAC from doing anything that might increase plaintiff's risk of nonpayment." [D.I. 70, at p. 15].

As detailed above, GMAC's first reason is wrong because Plaintiff's lawsuit alleges that the subordination caused by the Exchange Offer breaches Sections 12.01 and 6.04 of the Smart Notes Indenture.

Indeed, Count II of Plaintiff's claim for the breach of the implied covenant of good faith and fair dealing is straightforward.  A cause of action under the implied covenant of good faith and fair dealing obtains "when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Fourth Branch Assocs. Mechanicville v. Niagara Mohawk Power Corp.*, 653 N.Y.S.2d 412, 416 (N.Y. App. Div. 1997).  Plaintiff alleges that GMAC unfairly subordinated Smart Notes during the Exchange Offer since it is contrary to the explicit representation GMAC made in the Form S-3 filing that Smart Notes are "unsubordinated" and since the subordination deprives Plaintiff and the putative class of Smart Notes holders of their rights "to receive the benefits" under their indentures under Sections 12.01 and 6.04 of the Indenture.  These allegations plainly state a cause of action for breach of the implied covenant of good faith and fair dealing.  *See*, *e.g.*,

*Hackettstown Nat'l Bank v. D.G. Yuengling Brewing Co.*, 74 F. 110, 113-14 (2d Cir. 1896) ("[I]t must be held that, if the consent was made and the resolution passed by the majority of bondholders, not in the common interest of all, but in the interest of Yuengling, with a view of enabling him, by deferring for five years the payment of interest, to compel the minority bondholders to sell their bonds on such terms as he might dictate, it was a corrupt and unwarranted exercise of the power of the majority."); *In re Bd. of Dirs. of Multicanal S.A.*, 340 B.R. 154, 157-180 (Bankr. S.D.N.Y. 2006) ("The Court held that while Multicanal had justified its decision to offer U.S. retail holders only cash-in order to avoid a U.S. securities law problem-it had not justified the disparity in the amount of cash offered as compared to the value of the packages offered to large holders (as well as holders outside the United States). The Court rejected the relief recommended by the objecting noteholders, which was to deny recognition of the APE altogether. It found that there were or appeared to be at least two possible remedies: to give the U.S. retail holders the same choice among securities and cash that all other holders had, or to increase the value of the cash option.").

Moreover, this fair reading of the lawsuit is required so as to do "substantial justice" under Rule 8(f). *Starks v. Perloff Bros.,* 760 F.2d 52, 55 (3d Cir. 1985) ("An overly restrictive reading of a complaint is inconsistent with the mandate that pleadings shall be so construed as to do substantial justice."); *see also Libby v. L. J. Corp.*, 247 F.2d 78, 82 n.2 (D.C. Cir. 1957) ("The form of the complaint suggests, somewhat ambiguously, that both damages for breach of a contract and an accounting for breach of fiduciary relationship are sought; perhaps these ambiguities should, for present purposes, be resolved by reading the complaint as praying for damages or an accounting in the alternative. In all events, under Rule 8(f), we must read the complaint, however inartfully drawn, as one which, when and if supported, would entitle appellant to the relief warranted by the proof, rather than the relief formally claimed by the pleading. [While the entire story is not discernible from

the meager record before us, it would appear to present what is essentially an appeal to the equity

powers of the court.]") (Burger, J.) (footnote text included in brackets).

### 2. Rule 8 Permits Plaintiff to Plead Breach of the Implied Covenant of Good Faith and Fair Dealing in the Alternative

GMAC also contends that Plaintiff's claim under the implied covenant of good faith and fair

dealing should be dismissed because it is "impermissibly duplicative of his breach of contract

claim." [D.I. 70, at p. 15].

GMAC is mistaken.

Rule 8 allows Plaintiff to plead his claim under the implied covenant of good faith and fair

dealing in the alternative to his claim for breach of contract.[4]  For instance, the court in *Xpedior*

*Creditor Trust v. Credit Suisse First Boston (USA) Inc.,* 341 F. Supp. 2d 258, 272 (S.D.N.Y. 2004),

used Rule 8 to reject the same contention GMAC makes here:

> CSFB next argues that Xpedior's claim for breach of the implied covenants of good
> faith and fair dealing fail because, as a matter of New York law, the same operative
> facts cannot simultaneously give rise to claims for both implied and express
> covenants.  This is certainly an accurate statement of the law, and Xpedior does not
> contest that its good faith claims are indistinguishable from its contract claims.
>
> It does not follow, however, that this claim must be dismissed. To the contrary, the
> Federal Rules explicitly permit a party to plead causes of action in the alternative,

---

[4]	Rule 8(a)(3) provides that, in a complaint, "a demand for the relief sought, which may include relief in the alternative or different types of relief."  Rule 8(d) further provides, in pertinent part, that a complaint may also contain:

> (2) Alternative Statements of a Claim or Defense. A party may set out 2 or more
> statements of a claim or defense alternatively or hypothetically, either in a single
> count or defense or in separate ones. If a party makes alternative statements, the
> pleading is sufficient if any one of them is sufficient.
>
> (3) Inconsistent Claims or Defenses. A party may state as many separate claims or
> defenses as it has, regardless of consistency.

regardless of consistency.  Thus, while Xpedior may not press both claims to judgment, it is free to litigate both.

Putting that aside, moreover, Plaintiff's claim under the implied covenant of good faith and fair dealing is not duplicative of his claim for breach of contract.

| Plaintiff's Count for Breach of Contract | Plaintiff's Count for Breach of the Implied Covenant of Good Faith and Fair Dealing |
|---|---|
| 82.     Each of the Indentures provides that GMAC shall not issue, assume or guarantee any debt secured by the [respective] notes without effectively providing that the notes shall be secured equally and ratably with such debt.  The Exchange Offers violated that provision of the Indentures because the notes issued through the Exchange Offers are not secured equally and ratably with the Smart Notes. | 88.     Each of the Indentures imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement with respect to all of GMAC's bond holders. |
| 83.     Each of the Indentures provides that GMAC triggers default when GMAC generally is not paying its debts as the same become due.  The Exchange Offers trigger a default under that provision of the indenture agreements because the notes issued pursuant to the Exchange Offers subordinate the Smart Notes and there is a substantial likelihood that GMAC will not be able to pay the Smart Notes when they become due. | 89.     In addition to what is alleged above, Defendants did not engage in good faith and fair dealing in the performance and enforcement of the Indentures by, in the face of certain bankruptcy, debt default and other events of insolvency, attempting to unilaterally and arbitrarily cherry-pick among its bond holders and only honor GMAC's debt obligation to a limited number of a series of bond holders by subordinating the Smart Notes in favor of the newly-issued notes. |
| 84.     Each of the Indentures provides that GMAC cannot reduce the rate of or extend the time for payment of interest on the [respective] notes or reduce the principal or change the stated maturity of the [respective] notes, without the consent of affected noteholders.  The Exchange Offers violated that provision of the Indentures because the Smart Notes are subordinated to the new notes issued in the Exchange Offers, there is a substantial likelihood that GMAC will not be able to pay the Smart Notes when they become due, and because GMAC did not obtain the consent of Plaintiff or other affected noteholders. | 90.     Plaintiff and the members of the Class have and will continue to suffer damages as a direct and proximate result of Defendants' breach of their duty of good faith and fair dealing with respect to the Indentures.<br><br>[D.I. 65, ¶¶86-90]. |
| 85.     As a result of Defendants' breach, Plaintiff has suffered damages and will continue to be damaged in the future. | |
| [D.I. 65, ¶¶80-85]. | |

Indeed, Plaintiff's breach of the implied covenant claim is in accord with the allegations that were upheld in the authority upon which GMAC itself relies.  *See JPMorgan Chase Bank, N.A. v. IDW Group, LLC*, No. 08 Civ. 9116(PGG), 2009 WL 321222, at *7 (S.D.N.Y. Feb. 09, 2009) ("The

Complaint adequately alleges that IDW deprived it of the benefits of the Agreements" by failing to disclose its retention to poach Edsparr. . . . Accordingly, this Court denies IDW's motion to dismiss the claim that IDW breached the implied covenant by failing to inform JPMorgan that it had been retained by Citadel to recruit Edsparr on Citadel's behalf.").

### D. Plaintiff Properly Alleges a Claim Under the Trust Indenture Act

The Trust Indenture Act provides that "the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security … shall not be impaired or affected without the consent of such holder …." 15 U.S.C. § 77ppp(b). This provision was authoritatively construed on indistinguishable facts in *Federated Strategic Income Fund v. Mechala Group Jamaica Ltd.*, No. 99 CIV 10517 HB, 1999 WL 993648 (S.D.N.Y. Nov. 02, 1999). Because GMAC neglects to acknowledge *Mechala* -- supposedly because "case law on the Trust Indenture Act is sparse" [D.I. 70, at p. 21] -- its facts and holding set forth in detail below:

### 1. The Exchange Offers at Issue in *Mechala*

In *Mechala*, the plaintiff owned bonds offered by the defendant corporation when the defendant "began suffering from financial setbacks" and "realized that it could not repay the full principal amount of the [bonds]." *Mechala*, 1999 WL 993648, at *1. The defendant corporation thus devised "a cash tender offer for the [bonds]." *Id.*

Under the terms of the defendant's offer, the defendant agreed to purchase the bonds "at $351.57 per $1000 in principal and accrued interest." *Id.* The offer "would be consummated if a majority of holders tendered their Notes, as well as consented to certain proposed amendments to the indentures which were outlined in the offer." *Id.*

Nevertheless, during the pendency of the offer, a committee formed by the defendant "decided that the offer was inadequate and sought to negotiate a higher price for the notes." *Id.*, at *2. The offer was then rescinded and reformulated. *Id.*

25

The reformulation was styled as "Amendment to Offer to Purchase for Cash and Consent Solicitation," which kept most of the terms the same and increased the "offer consideration to $450 per $1000 of principal (45¢ on the dollar), and, [in addition], offered a Consent Payment in the aggregate amount of $2 million, which was to be paid on a pro rata basis to holders who tendered their notes and consented to the amendments on or before [the deadline]." *Id*., at *3. Yet, the notes held by the defendant company and its affiliates were excluded from the offer. *Id*. Importantly, moreover, the offers eliminated several restrictive covenants from the bonds, including those related to "certain events of default" and the guarantee of the notes related to "defendant's subsidiaries," and converted the defendant company into "a holding company whose only assets will be a nominal amount of cash and other assets." *Id*., at *4.

2.      **The Parties' Arguments Regarding the Legality of the Exchange Offers**

The plaintiff in *Mechala* filed a "complaint for preliminary and permanent injunctive relief, and a declaratory judgment, alleging that the tender offer violates the indentures, the Trust Indenture Act of 1939, and the disclosure laws for tender offers." *Id*., at *3-*4.

At the hearing on the motion, a member of the committee formed by the defendant to fashion the exchange offers testified that: a) only institutional holders of the bonds, and not individual holders, were represented by the committee; b) other than the bond holders, no creditors of the company were "being asked to take a 55% discount on their debt"; and c) the company's "intent" behind the exchange offers was "to repay its other creditors in full." *Id*., at *4-*5.

With that testimony as supporting evidence, the plaintiff claimed that the exchange offers violated the Trust Indenture Act because "the indentures require, by their terms, unanimous consent of all holders when certain rights under the contract are 'impaired,' namely the right to receive payment of principal and the right to institute suit for the enforcement of payment." *Id*., at *5.

The defendant argued, in contrast, as Defendants do here, that the exchange offers did not require unanimous consent from bond holder because the exchange offers did not "impair" any rights. *Id.*, at *6.

Judge Baer framed the issue as follows:

> The question for this Court then is whether the offer and its proposed amendments impair the right to receive payment or impair the right to sue for the enforcement of any such payment. Or, put another way, does a plain reading of the indentures and the **application of the Trust Indenture Act** require unanimous consent of all the affected holders?

*Id.*, at *6.

### 3.      Judge Baer's Analysis

Important to Judge Baer was the fact that the exchange offers would "include stripping certain restrictive covenants in the indentures, such as maintaining an agent for service in New York, jurisdictional provisions, waiver of immunities, and events of default." *Id*. As a result, he concluded that there was "no meaningful recourse for plaintiffs or any noteholder who concludes this is a bad deal and chooses not to tender their notes, but rather to wait and sue for payment upon maturity." *Id*.

Moreover, Judge Baer found that the exchange offers were inextricably-linked to the defendant company's planned reorganization and, for that reason, "a proposed amendment that impairs or affects, by its effect and not necessarily by its terms, a holder's right to sue and recover payment could in certain circumstances constitute a violation." *Id*. at *7. Therefore, Judge Baer concluded, as if he were acknowledging the effect of GMAC's capital restructuring scheme on the Smart Notes at issue here:

> A holder who chooses to sue for payment at the date of maturity will no longer, as a practical matter, be able to seek recourse from either the assetless defendant or from the discharged guarantors. ***It is beyond peradventure that when a company takes steps to preclude any recovery by noteholders for payment of principal coupled with the elimination of the guarantors for its debt, that such action does not constitute an "impairment" or "affect" the right to sue for payment.***

*Id.* at *7.  In addition, Judge Baer found that even though the defendant claimed that it had obtained consent for the exchange offers by 77% of the bond holders and that obtaining the remaining 23% "may be a practical impossibility," unanimous consent from 100% of the bondholders was required because "it is still the law that there is no inherent right to proceed with an unlawful tender offer if a violation of the indentures has in fact occurred."  *Id.*

### 4.    Application of *Mechala*

*Mechala* is on all-fours with this case.  In *Mechala*, institutional investors, to the exclusion individual investors, were represented by the committee formulating the exchange offers.  Here, as in *Mechala*, the Exchange Offer was only open to those individuals and entities which GMAC unilaterally determine are qualified to participate.  Likewise, the Exchange Offer impairs the rights of Plaintiff and the putative class of Smart Notes holders under the Trust Indenture Act because their Smart Notes have been subordinated by the New Notes issued in the Exchange Offer – indeed, subordinated in direct contravention to what GMAC represented in the Form S-3 registration statement.  Therefore, *Mechala* stands for the proposition that the fact that the Smart Notes have been subordinated causes harm to the holders, regardless of whether GMAC is currently in bankruptcy or whether there is a temporary, unexplained rise in the price of the bond.  *See also Spectrasite Holdings*, 2002 WL 32173072, at *4 ("Should Defendants file a bankruptcy action, a court may find that the Tender Offer Transactions, entered into at a time near the bankruptcy, impaired the rights of the Indentures by incurring significant senior debt."); *accord Mann v. Oppenheimer & Co.*, 517 A.2d 1056, 1062 (Del. 1986) (genuine issue of fact as to whether company would actually redeem the bonds pursuant to an exchange offer).  Moreover, Plaintiff's claim under the Trust Indenture Act, like the claim in *Mechala*, has merit.

### 5.    GMAC Relies on Irrelevancies

Rather than address *Mechala*, GMAC contends that Plaintiff has not properly alleged that the Smart Notes have been subordinated, relying on alleged facts that have no bearing on the legal analysis (*i.e.*, that GMAC is not currently bankrupt and that the price of the bonds increased since the date of the restructuring).  On the question of subordination, GMAC glibly, and in a footnote no less, casts aside the statement from its own spokeswoman that the Exchange Offer caused the Smart Notes to be subordinated to the New Notes as having no "legal effect."  [D.I. 70, at p. 19, n.11]. Although this, at best, raises an issue of fact about the subordination of the Smart Notes that cannot be determined at the pleading stage, the sum total of GMAC's position is that because GMAC has not yet gone into bankruptcy and because there appears to be a temporary, unexplained rise in the price of the Smart Notes in charts GMAC has created and attached to its brief, there is no harm to the Smart Notes.  [D.I. 70, at pp. 16-21].

GMAC is mistaken.  First of all, GMAC's charts are inherently unreliable since they appear to date pricing of the Smart Notes back to the year 1900, [D.I. 71-3, at pp. 13, 18, 23, 28], long before the Smart Notes were even in existence, much less GM Corporation or GMAC.  Moreover, GMAC mysteriously does not provide price charts for all of the Smart Notes, but only for the Smart Notes Plaintiff owns.  Furthermore, there is no way for this Court to conclude that any subsequent rise in the price of the Smart Notes means that the Exchange Offer itself did not harm the holders of the Smart Notes.  This Court has not been provided with any expert or otherwise competent evidence as to the true value of the Smart Notes, much less any case law that stands for the nonexistent proposition GMAC is asking this Court to swallow, *i.e.*, that discriminatory bond subordination is acceptable as long as the price of the bonds increased as of some future date.

### E.      Plaintiff's Equitable Claims Have Merit

Plaintiff's alternative claims for equitable subordination and equitable rescission are grounded in the Court's broad equitable powers. *See*, *e.g.*, *Bonham v. Coe*, 292 N.Y.S. 423, 436 (N.Y. App. Div. 1937) ("A prayer for general relief is as broad as the equitable powers of the court, and under it the court may properly shape its decree in accordance with the equities of the case.").

GMAC contends that Plaintiff is not entitled to the equitable claims because Plaintiff "alleges nothing about the conduct of the bondholders who participated in the Exchange Offer, much less that their conduct was fraudulent or otherwise inequitable." [D.I. 70, at p. 25].  GMAC entirely misses the point about GMAC's inequitable conduct.  As a result of the Exchange Offer, GMAC's Form S-3 registration statement for the Smart Notes is now false and, along with it, GMAC's representation that the Smart Notes would not be subordinated.  Holders of Smart Notes now own debt securities that are materially different than what the holders were promised in the Form S-3 and in the Indenture.  Indeed, Plaintiff could not describe this inequitable conduct any clearer:

> The Exchange Offers unfairly, arbitrarily, and discriminatorily attempted to restructure GMAC's debt to the detriment of all holders of Smart Notes, the Exchange Offers violate equity, fairness, rationality, and the essential principles of free market capitalism.

[D.I. 65, ¶¶102, 107].

Beyond that, GMAC's position on Plaintiff's equitable claims is, at bottom, a motion to dismiss for failure to join indispensible parties under Rule 12(b)(7).  Indeed, GMAC neglects to invoke Rule 12 by name at any point in its brief.  Instead, GMAC contends that because somehow the holders of the New Notes and the United States Department of Treasury are not parties to this action, Plaintiff is not entitled to relief.  [D.I. 70, at p. 21].  However, not only does GMAC fall far short of proving the merits of its contentions that the holders of the New Notes and the United States Department of Treasury are indispensible parties to this action, GMAC's contention necessarily

raises issues of fact that cannot be decided at this pleading stage. *See*, *e.g.*, *Sakelaris v. Danikolas*, No. 2:05-CV-158 PPS, 2006 WL 2644948, at *4 (N.D. Ind. Sept. 14, 2006) ("Because we find that the Court lacks a complete record on which to determine whether Lake County is an indispensable party for purposes of Rule 19, Danikolas's Motion for Judgment on the Pleadings  is DENIED."); *Limited, Inc. v. El Al Israel Airlines*, No. 98 CIV 5651(LAP), 1999 WL 588290, at *3 (S.D.N.Y. Aug. 04, 1999) ("A motion to dismiss for failure to join a necessary party under Rule 19(a) and (b) should not be granted where there are issues of fact regarding the indispensability of the alleged necessary party.  First, Inway has failed, as a threshold matter, to establish that Cargo Connection is a necessary party under Rule 19(a). Second, dismissal of the action on these grounds is further unwarranted because Inway can sue Cargo Connection for indemnity, or, if the facts develop to indicate Cargo Connection should be a party to this action, plaintiffs can, as they have agreed to do, amend the complaint to add Cargo Connection."); *Wheaton v. Diversified Energy, LLC*, No. Civ.A. 03-CV-105, 2003 WL 23162404, at *3 (E.D. Pa. Dec. 16, 2003) ("[A]lthough Defendant has submitted some evidence that J.F. Energy was Plaintiff's employer, Plaintiff has responded by pointing to evidence that J.F. Energy assigned the Contract to Defendant. It would be premature for us to decide on this limited record which entity employed Plaintiff when he was terminated. Instead, we will allow the parties to conduct discovery on that issue."); *Van Kirk v. Campbell*, 7 F.R.D. 231, 232 (S.D.N.Y. 1946) ("Whether the two Banks and the Realty Company are indispensable parties, in respect to the first cause of action, because of an agreement dated Nov. 22, 1943 may well depend upon the surrounding facts and circumstances leading up to the making of that agreement. Because of this uncertainty, and other issues raised by the pleadings which give rise to factual issues, it would certainly be more equitable to have a hearing on the merits before deciding such an issue.").

As far as GMAC's other contention that Plaintiff's claim for equitable rescission is not properly stated because Plaintiff does not, according to GMAC, allege that he has adequate remedy at law, GMAC is also wrong.  The seminal decision in *Callanan v. Powers*, 92 N.E. 747, 752-53 (N.Y. 1910), is directly on point:

> ***Rescission was the object of the action, and the plaintiff had the right to allege as many grounds for rescission as he saw fit.***  He could allege in the same complaint fraud in entering into the contract as one ground for rescission, the continuous and substantial breach of the contract as another ground, and the repudiation of a material stipulation as a third ground.  In other words, he could allege as many grounds as he thought he could prove, and the defendants take nothing from the fact that he failed as to fraud when he succeeded upon the other grounds. . . .The referee found, as separate and distinct grounds upon which rescission should be predicated . . . We think the facts found expressly, without aid from implication, support the judgment, and that the evidence supports the findings. There is no hard and fast rule on the subject of rescission, for the right usually depends on the circumstances of the particular case. It is permitted for failure of consideration, fraud in making the contract, for inability to perform it after it is made, for repudiation of the contract or an essential part thereof, and for such a breach as substantially defeats its purpose . . . Failure to perform in every respect is not essential, but a failure which leaves the subject of the contract substantially different from what was contracted for is sufficient.  ***If the party who seeks rescission has an adequate remedy at law, ordinarily he is not entitled to rescind, but in case of repudiation, or of a breach going to the root of the contract, unless the damages can be ascertained with reasonable certainty, rescission is a matter of right, with restitution instead of compensation***. . . . There was such a failure to perform the substance of the contract as to defeat its purpose in nearly every essential respect. Even if an action at law were possible to a  plaintiff suing in a representative capacity, it is obvious that the damages for such breaches of such a contract could not be estimated with precision. . . .The plaintiff, assuming to act in a representative capacity, elected to rescind and stood by his election, and what the defendants have done since is immaterial except as equity may require such restitution of subsequent additions or improvements as can be made without injury to the plaintiff or the company.  Tender of restitution in the complaint is sufficient in an action in equity brought for a rescission. ***There was no remedy at law open to the plaintiff, for a representative action, brought to compel a corporation to do something which it ought to do, but cannot do because it is under the control of the other defendants, is necessarily an equitable action.*** The plaintiff had no standing except in equity, for he could not represent other stockholders or the railroad company in any other forum. An express finding that he had no remedy at law was unnecessary, for that is a legal conclusion flowing from the nature of the action.

32

Just as in *Callahan*, Plaintiff here has alleged that GMAC has materially altered the contractual relationship such that rescission is proper, *i.e.*, GMAC's Exchange Offer materially altered the contractual relationship for the Smart Notes since the Form S-3 registration statement that the Smart Notes would not be subordinated is false, because the Smart Notes Indentures have been breached, and because GMAC is in violation of the Trust Indenture Act.

### F.     The Lawsuit Properly Establishes Liability for the Board Defendants

The Board Defendants misapprehend Plaintiff's allegation.  Plaintiff's claim against the Board Defendants is based on the allegation that they knowingly ratified and were the "but for" cause of the Exchange Offer, and the Exchange Offer tortiously interfered with the Smart Notes, including Plaintiff's holding, since the Exchange Offers breached the Smart Notes Indenture, breached the implied covenant of good faith and fair dealing, violated the Trust Indenture Act, and entitle Plaintiff to equitable relief. [D.I. 65, ¶¶108-114].

It is black letter law that an individual can be personally liable for all torts which that individual committed, notwithstanding the person may have acted as an agent or under the direction of another.  3A *Fletcher Cyc. Corp.* §1135.  This rule applies to board members acting in their official capacities, including GMAC's Board.  *Id.*  Whether the corporation or the corporate officers themselves benefited is immaterial as to whether the corporate officers are liable to third parties.  *Id.*; *see T.V. Spano Bldg. Corp.* v. *Dep't of Natural Res. & Envtl. Controls*, 628 A.2d 53, 61 (Del. 1993) (relying on Fletcher's treatise and stating, "We hold that corporate officers may be held personally liable in appropriate circumstances for actually making corporate decisions resulting in the improper disposition of hazardous waste under the Act."); *Bano v. Union Carbide Corp.*, 273 F.3d 120, 133 (2d Cir. 2001) ("Under New York law, a corporate officer who commits or participates in a tort, even if it is in the course of his duties on behalf of the corporation, may be held individually liable.").

33

The Board Defendants neglect to acknowledge this doctrine. For that reason, their contentions that liability cannot attach because they would have to be parties to the Smart Notes Indentures, [D.I. 73, at p. 1], or because the Board Defendants owed no fiduciary duty to the Smart Notes holders, [D.I. 73, at p. 2], are unfounded. Neither condition is necessary or material to the board defendants' liability to the Smart Notes holders under the doctrine. *Cf. Ruckle v. Roto Am. Corp.*, 339 F.2d 24, 26 (2d Cir. 1964) ("[W]e hold that federal courts have jurisdiction over actions in which the complaint alleges that a corporation has been or may be defrauded into issuing or selling securities through the failure or refusal of some of its directors fully to disclose to the remaining directors material facts concerning the transactions or the financial condition of the corporation.").

Nor is there merit to the Board Defendants' contention that they are somehow immunized because of the "no recourse" clause in the Indenture, [D.I. 73, at p. 6]. The authority upon which the Board Defendants purport to rely expresses that liability clauses only apply to contract claims against directors. *LaSalle Nat'l Bank v. Perelman*, 141 F. Supp. 2d 451, 462 (D. Del. 2001). ("In sum, the court finds that the no recourse provisions of the Holdings, Parent and Marvel III indentures are similar in scope to the no recourse provisions limited to contract claims in *Bankers Trust*, *Small*, *Geyer* and *Mabon*. Therefore, the court concludes that the no recourse provisions bar only contract claims."). Plaintiff's claim against the Board Defendants is not a contract claim or for breach of the Smart Notes Indenture itself, but is instead a tort claim for which any liability limitation in the Indenture would have no applicability.

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff respectfully asks this Court to deny the motions to dismiss in their entirety.

/s/ Joel Friedlander
Joel Friedlander (#3163)
Sean M. Brennecke (#4686)
BOUCHARD MARGULES & FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE  19801
(302) 573-3500
jfriedlander@bmf-law.com
sbrennecke@bmf-law.com
*Attorneys for Plaintiff*

OF COUNSEL:

COUGHLIN STOIA GELLER RUDMAN
   & ROBBINS LLP
Paul J. Geller
Jonathan M. Stein
Stuart A. Davidson
Cullin A. O'Brien
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
(561) 750-3000

COUGHLIN STOIA GELLER RUDMAN
   & ROBBINS LLP
Samuel H. Rudman
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100

RICHARD WALDEN
Walden Law Firm, PLLC
8201 Cantrell, Suite 315
Little Rock, AR 72227
(501) 907-7000

DATED:  August 31, 2009